Filed 5/18/15

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| In re R.V., a Person Coming Under the Juvenile Court Law. | ) ) ) ) | |
| THE PEOPLE, | ) ) | S212346 |
| Plaintiff and Respondent, | ) ) ) | Ct.App. 4/3 G046961 |
| v. | ) ) | Orange County Super. Ct. No. DL034139 |
| R.V., | ) ) ) | |
| Defendant and Appellant. | ) ) ) | |

A minor who is the subject of a wardship petition under Welfare and Institutions Code[1] section 601 or 602 has, like an adult facing criminal prosecution, a due process right not to be tried while mentally incompetent. Section 709 establishes procedures for juvenile courts to follow so as to ensure that minors are not subject to adjudication while their competency is impaired.

We decide two issues in this case; first, whether under section 709 a minor is presumed competent and bears the burden of proving otherwise by a preponderance of the evidence and, second, what is the proper standard for

---

[1] All further unlabeled statutory references are to the Welfare and Institutions Code.

reviewing on appeal a challenge to the sufficiency of the evidence supporting the juvenile court's determination that the minor was competent to proceed.

Section 709 is silent regarding the presumption of competency and allocation of the burden of proof, but we find that the most straightforward reading of the statute's text is that the provision contains an implied presumption of competency. This understanding of section 709 is further supported by the legislative materials surrounding that statute's enactment, which show that lawmakers intended the juvenile courts to continue to apply to minors the adult competency scheme's presumption of competency and allocation of the burden of proof to the party claiming incompetency.

We conclude furthermore that, like a challenge to the sufficiency of the evidence supporting the verdict in an adult competency proceeding, a claim of insufficient evidence to support a juvenile court's determination in a competency proceeding is reviewed deferentially under the substantial evidence test. In the present matter, the evidence before the juvenile court consisted solely of the court-appointed expert's report and testimony, and the materials on which the expert based his opinion, that 16-year-old R.V. was incompetent to stand trial. In these circumstances, we review the juvenile court's determination by asking whether the weight and character of that evidence is such that the juvenile court could not reasonably have rejected it.

Having viewed the evidence presented in the case in the light most favorable to the juvenile court's determination of competency, as we must, we nonetheless conclude that the court could not reasonably have rejected the qualified expert's compelling, well-supported, and unequivocal opinion that minor was not competent to proceed to trial.

The Court of Appeal concluded, to the contrary, that the juvenile court's reasons for declining to accept the expert's opinion were supported by substantial

2

evidence in the record, and upheld the judgment below.  Accordingly, the Court of Appeal's judgment is reversed.

## I. BACKGROUND

On a weekday morning in March 2012, officers from the La Habra Police Department responded to a 911 call reporting that a juvenile was threatening family members with a knife.  Jose Cruz, who resided with minor, minor's stepsibling, and minor's mother, told police that he had awakened minor for school around 7:00 a.m.  Minor became angry and starting throwing things, saying he did not want to go to school.  Cruz argued with minor, warning him that he was going to miss his bus.  In response, minor clenched his fists and told Cruz, "I'm going to fuck you up," then continued to throw and kick things around the living room.  When Cruz told minor to calm down, minor held out a knife and said he would kill Cruz if he called the police.  According to Cruz, minor did not move toward him with the weapon.

Minor's mother confirmed that minor had been throwing things around the living room, and told police that she saw him knock a small television set to the floor.  According to minor's mother, minor moved from the living room to the bedroom and started yelling, "I want a house.  I want my own space."  He warned his mother, "Don't come close to me.  I have a knife."  Minor's mother saw that he had a small silver knife in his hand.

Javier Naranjo, the family's landlord, also spoke with the officers.  He told them that he had entered the residence after hearing the sound of something breaking and saw minor kick a DVD player in the living room.  He also overheard minor arguing with Cruz and threatening to stab him with a knife.  When Naranjo likewise told minor to calm down, minor threatened to kill him as well.  Naranjo then saw minor go into his bedroom and stab a bed three times.

3

Minor complied with the officers' order to raise his hands in the air. As minor was being handcuffed, he mentioned that the knife, a multitool with a two-inch blade, was in his front right pocket. Minor explained to one of the officers that he was upset and trying to scare his mother, and indicated that he had trouble with his parents. According to that officer's report, minor appeared to have a difficult time understanding the officer's questions and seemed confused about the incident.

All three witnesses reported to police that minor had psychological problems. His mother indicated that for the past four weeks he had not taken his medication, Abilify. Cruz explained that minor is "different every day" and "with each episode he gets worse." Minor was taken into custody and transported to a juvenile detention facility.

Three days after the incident, the Orange County District Attorney filed a section 602 petition to declare minor a ward of the juvenile court. The petition alleged that minor committed two misdemeanor counts of brandishing a deadly weapon (Pen. Code, § 417, subd. (a)(1)), and one misdemeanor count of vandalism (Pen. Code, § 594, subds. (a), (b)(2)(A)). About three weeks later, defense counsel expressed a doubt regarding minor's competency to stand trial. In accordance with statutory procedures, the court determined there was substantial evidence raising a doubt as to minor's competency, suspended proceedings, and appointed a forensic psychologist, Haig J. Kojian, Ph.D., to evaluate minor. (See § 709, subd. (a).) Although the court also ordered minor released on the home supervision program pending the competency hearing, minor was returned to juvenile detention 10 days later for violating the conditions of his release.

Dr. Kojian's nine-page report concluded that minor presently was not competent to stand trial. Although defense counsel offered to submit the question of competency on the basis of Dr. Kojian's written report, the prosecutor

expressed concern that Dr. Kojian had not administered any diagnostic tests to minor and requested a hearing at which Dr. Kojian could be questioned. The court granted the request.

At the hearing held one week later, Dr. Kojian explained, consistently with his written report, the basis for his conclusion that minor was not competent to stand trial. At the conclusion of the hearing, the court expressed its view that the law presumes minor is competent and places on him the burden of proving incompetency by a preponderance of the evidence. The court then ruled that minor had not met his burden of proof, found minor competent to stand trial, and ordered the reinstatement of proceedings.

Immediately after the court's competency determination, minor waived his various rights and entered a "slow plea," submitting the matter to the court for adjudication based on the police report. The court found the allegations in the wardship petition to be true, declared minor a ward of the juvenile court, and placed him on probation.

The Court of Appeal affirmed the judgment. It first agreed with the juvenile court that a minor is presumed competent and bears the burden of proving by a preponderance of the evidence that he or she is not competent to be adjudicated under the juvenile court law. Applying a substantial evidence standard of review, the Court of Appeal upheld the juvenile court's determination that minor was competent to proceed and affirmed the judgment.

This court granted minor's petition for review.

5

## II. Discussion

### A. Presumption of competency and allocation of the burden of proof in proceedings to determine juvenile competency under section 709

We briefly review the law regarding competency to stand trial and some of the legal developments that preceded the enactment of section 709. This history guides our interpretation of the statute.

#### 1. *Overview of the law predating section 709*

The constitutional right to due process of law prohibits the trial of a mentally incompetent criminal defendant. (*People v. Medina* (1990) 51 Cal.3d 870, 881; *Drope v. Missouri* (1975) 420 U.S. 162, 172-173.) Due process principles further require trial courts to employ procedures to guard against the trial of an incompetent defendant. (*People v. Hale* (1988) 44 Cal.3d 531, 539; *People v. Pennington* (1967) 66 Cal.2d 508, 518; *Pate v. Robinson* (1966) 383 U.S. 375, 377.) Under *Dusky v. United States* (1960) 362 U.S. 402 (*Dusky*), the inquiry into a defendant's competency to proceed focuses on whether the defendant " 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and . . . a rational as well as factual understanding of the proceedings against him.' " (*Id*. at p. 402 (the *Dusky* standard).)

The constitutional prohibition against trial of an incompetent defendant and the requirement of procedures to prevent trial from occurring under those circumstances are mirrored in Penal Code section 1367 et seq. Similar to the *Dusky* standard, state law provides that a defendant is incompetent if he or she "is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense." (Pen. Code, § 1367, subd. (a).)

Under statutory procedures for determining a criminal defendant's competency to stand trial, the defendant is presumed competent unless proved

incompetent by a preponderance of the evidence.  (Pen. Code, § 1369, subd. (f); *People v. Medina, supra,* 51 Cal.3d at p. 881.)  On its face, the statutory scheme does not expressly impose the burden of proof on any specific party.  Rather, the presumption of competency operates to place the burden of proof on the party claiming the defendant is incompetent.  (See Evid. Code, §§ 605, 606; *People v. Rells* (2000) 22 Cal.4th 860, 867, 868.)

Penal Code section 1367 et seq., by its terms, applies to criminal prosecutions, not to juvenile court proceedings.  In *James H. v. Superior Court* (1978) 77 Cal.App.3d 169 (*James H.*), however, the Court of Appeal held that the juvenile had a due process right to a competency adjudication as part of a section 707, subdivision (b), proceeding to determine his fitness to be dealt with under the juvenile court law.  (*James H.*, *supra*, at pp. 174-176.)  The Court of Appeal reasoned that its conclusion was compelled, in part, by the high court's decision in *In re Gault* (1967) 387 U.S. 1, which held that a juvenile facing possible loss of liberty pending the outcome of a delinquency proceeding is entitled to the same " 'essentials of due process and fair treatment' " (*id*. at p. 30) as defendants in adult criminal proceedings, including the right to effective counsel.  (*James H., supra*, at pp. 173-174; see *In re Gault, supra*, at pp. 30-31, 35-42.)

The Court of Appeal in *James H.* acknowledged the absence of existing statutory procedures for juvenile competency determinations.  It concluded, however, that the juvenile court has inherent authority to conduct such hearings.  (*James H., supra,* 77 Cal.App.3d at pp. 175-176.)  As the Court of Appeal observed, juvenile courts routinely improvise procedures to meet changing constitutional requirements while awaiting legislative clarification.  (*Id*. at p. 176.)  In this regard, at the time of the *James H.* decision, juvenile courts appear to have been making use of adult competency procedures in wardship proceedings under sections 601 and 602.  (See, e.g., *In re Ramon M*. (1978) 22 Cal.3d 419, 430,

7

fn. 14 [noting the People's concession that "the protective reach of Penal Code section 1368 extends to section 602 proceedings in juvenile court"].)  The *James H*. decision likewise fashioned a Penal Code section 1368-like procedure for juvenile courts making competency determinations.  The procedure required the court to suspend proceedings and conduct a competency hearing in the event it entertained a doubt regarding the juvenile's capacity or ability to cooperate with his or her attorney.  With regard to the definition of incompetence, the *James H*. decision advised juvenile courts either to borrow the formulation in Penal Code section 1367 or to use the test set forth in the high court's decision in *Dusky, supra,* 362 U.S. 402.  (*James H., supra*, at pp. 176-177; see *Timothy J. v. Superior Court* (2007) 150 Cal.App.4th 847, 857-858 (*Timothy J*.).)  The decision did not address the presumption of competency or burden of proof.

In 1999, the Judicial Council added former rule 1498 to the California Rules of Court in order to establish statewide procedures for conducting a hearing to determine the competency of a juvenile subject to a wardship proceeding under section 601 or 602.  The rule was intended to, and largely did, conform to the procedures described in the *James H*. decision and established as the definition of competency an abbreviated version of the *Dusky* standard.[2]  (Advisory Com. com., 23 pt. 3 West's Ann. Codes, Rules (2005 ed.) foll. rule 1498(d), p. 630; see *Timothy J., supra*, 150 Cal.App.4th at pp. 858, 859.)  It also authorized, but did not require, the court to appoint an expert to evaluate the juvenile's competency to proceed.  (Cal. Rules of Court, former rule 1498(d)(1).)

---

[2]   Effective January 1, 2007, California Rules of Court, former rule 1498 was amended in ways not relevant here and was renumbered rule 5.645.  The portion of the renumbered rule relating to competency to stand trial appears in rule 5.645(d).

Subsequent to the adoption of California Rules of Court, former rule 1498, the Court of Appeal in *Timothy J., supra*, 150 Cal.App.4th 847, held that the rule permitted a finding of incompetence arising from the minor's developmental immaturity. This construction of former rule 1498 distinguished the juvenile competency standard from Penal Code section 1367, subdivision (a), which requires a showing that the adult defendant's incompetence arose from either a mental disorder or developmental disability. (*Timothy J., supra*, at pp. 858-861.) In *Tyrone B. v. Superior Court* (2008) 164 Cal.App.4th 227 (*Tyrone B.*), the Court of Appeal held that, notwithstanding the permissive language of the rule, the juvenile court *must* appoint an appropriate expert to evaluate the minor when the minor's counsel expresses a doubt regarding the minor's competency and the court finds substantial evidence raises a doubt in this regard. (*Id*. at p. 231 [construing rule 5.645(d), the current version of the rule].)

A decade after the adoption of California Rules of Court, former rule 1498, the Legislature enacted section 709, codifying some of the standards and procedures that had been established in the rules of court, and modifying or adding others consistently with the holdings in decisions such as *Timothy J., supra*, 150 Cal.App.4th 847, and *Tyrone B., supra*, 164 Cal.App.4th 227. The Legislature also provided for the Judicial Council's continued involvement in this area by expressly delegating to that body the task of developing and adopting rules regarding the special qualifications an expert must possess in order to be appointed by the court to evaluate a minor's competency. (Stats. 2010, ch. 671, § 1.)

### 2. *Section 709*

Section 709 begins by describing the mechanisms by which the issue of competency arises. The statute provides in relevant part that "[d]uring the pendency of any juvenile proceeding, the minor's counsel or the court may

9

express a doubt as to the minor's competency." (§ 709, subd. (a).)  Like the juvenile competency procedures adopted in the Rules of Court, section 709 uses the *Dusky* standard to define competency.  The statute does not employ an abbreviated form of the standard, however, and establishes the inquiry as whether the minor "lacks sufficient present ability to consult with counsel and assist in preparing his or her defense with a reasonable degree of rational understanding, or lacks a rational as well as factual understanding, of the nature of the charges or proceedings against him or her."  (§ 709, subd. (a).)

The statute further provides that if the court finds "substantial evidence raises a doubt as to the minor's competency," the proceedings must be suspended and the court must order a hearing to determine the minor's competency.  (§ 709, subds. (a), (b).)  Toward that end, the court is required to "appoint an expert to evaluate whether the minor suffers from a mental disorder, developmental disability, developmental immaturity, or other condition and, if so, whether the condition or conditions impair the minor's competency."  (§ 709, subd. (b).)  In order to qualify for appointment under section 709, the expert must be proficient in child and adolescent development and familiar with the applicable standards and criteria for evaluating competency.  As mentioned above, the statute assigns to the Judicial Council the responsibility for developing and adopting rules to implement such requirements.  (*Id*., subd. (b).)

Section 709 then describes how the court should proceed, depending on the outcome of the competency determination.  "If the minor is found to be incompetent by a preponderance of the evidence," the proceedings remain suspended for a reasonable period of time until it can be determined whether there is a substantial probability that the minor will attain competency in the foreseeable future while the court still retains jurisdiction.  (§ 709, subd. (c).)  If, on the other

hand, "the minor is found to be competent, the court may proceed commensurate with the court's jurisdiction."  (§ 709, subd. (d).)[3]

[3]      Section 709, subdivisions (a) through (e), reads in full:  "(a) During the pendency of any juvenile proceeding, the minor's counsel or the court may express a doubt as to the minor's competency.  A minor is incompetent to proceed if he or she lacks sufficient present ability to consult with counsel and assist in preparing his or her defense with a reasonable degree of rational understanding, or lacks a rational as well as factual understanding, of the nature of the charges or proceedings against him or her.  If the court finds substantial evidence raises a doubt as to the minor's competency, the proceedings shall be suspended.

"(b) Upon suspension of proceedings, the court shall order that the question of the minor's competence be determined at a hearing.  The court shall appoint an expert to evaluate whether the minor suffers from a mental disorder, developmental disability, developmental immaturity, or other condition and, if so, whether the condition or conditions impair the minor's competency.  The expert shall have expertise in child and adolescent development, and training in the forensic evaluation of juveniles, and shall be familiar with competency standards and accepted criteria used in evaluating competence.  The Judicial Council shall develop and adopt rules for the implementation of these requirements.

"(c) If the minor is found to be incompetent by a preponderance of the evidence, all proceedings shall remain suspended for a period of time that is no longer than reasonably necessary to determine whether there is a substantial probability that the minor will attain competency in the foreseeable future, or the court no longer retains jurisdiction.  During this time, the court may make orders that it deems appropriate for services, subject to subdivision (h), that may assist the minor in attaining competency.  Further, the court may rule on motions that do not require the participation of the minor in the preparation of the motions.  These motions include, but are not limited to, the following:

"(1) Motions to dismiss.

"(2) Motions by the defense regarding a change in the placement of the minor.

"(3) Detention hearings.

"(4) Demurrers.

"(d) If the minor is found to be competent, the court may proceed commensurate with the court's jurisdiction.

*(footnote continued on next page)*

11

### 3. *Statutory construction of section 709*

In construing the statute, "we are guided by the overarching principle that our task ' "is to determine the intent of the enacting body so that the law may receive the interpretation that best effectuates that intent. [Citation.]" ' " (*Los Angeles Unified School Dist. v. Garcia* (2013) 58 Cal.4th 175, 186.) Our analysis begins with the language of the statute, which " 'generally is the most reliable indicator of legislative intent.' " (*People v. Cornett* (2012) 53 Cal.4th 1261, 1265.) " ' " 'When the language of a statute is clear, we need go no further.' [Citation.] But where a statute's terms are unclear or ambiguous, we may 'look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, . . . and the statutory scheme of which the statute is a part.' " [Citation.]' [Citation.]" (*People v. Scott* (2014) 58 Cal.4th 1415, 1421; accord, *Lopez v. Superior Court* (2010) 50 Cal.4th 1055, 1063.)

Minor argues that section 709 does not place the burden of proving incompetence on either party. As he points out, section 709, unlike Penal Code section 1369, subdivision (f), does not expressly provide for a presumption of competency. The Attorney General, for her part, maintains that section 709 contains an implied presumption of competency and allocates the burden of rebutting that presumption to the party seeking a determination of incompetency.

We agree with the Attorney General that the most straightforward reading of the text of section 709 is that minor is presumed competent. Competency procedures are triggered and proceedings are suspended when "the court finds

---

*(footnote continued from previous page)*

"(e) This section applies to a minor who is alleged to come within the jurisdiction of the court pursuant to Section 601 or 602."

12

substantial evidence raises a doubt as to the minor's competency . . . ." (§ 709, subd. (a).) If no doubt is raised, or there is no substantial evidence to support such a doubt, the minor is treated as competent and subject to adjudication of the wardship petition, and the proceedings simply run their course. Were a minor not presumed competent, the statute arguably would require an affirmative showing of competency to proceed. The statutory text also suggests that the party asserting the minor's incompetency bears the burden of proof. Section 709, subdivision (c), requires the continued suspension of proceedings on a finding of incompetency by a preponderance of the evidence. By contrast, subdivision (d) provides for the reinstatement of proceedings "if the minor is found to be competent," but does not refer to any standard of proof.

We acknowledge that section 709's silence regarding any presumption of competency and allocation of the burden of proof permits other possible interpretations of the statutory text. We find, however, that our understanding of section 709 to include an implied presumption of competency is supported by the provision's legislative history and statutory purpose. (See *City of Brentwood v. Central Valley Regional Water Quality Control Bd.* (2004) 123 Cal.App.4th 714, 722-727 [examining extrinsic aids to determine which party bore the burden of proving the applicability of exceptions to a mandatory minimum penalty for violating provisions of a waste water permit when the governing statute was silent as to which party bore the burden of proof].)

### a. Legislative history

The materials considered by lawmakers in connection with the enactment of section 709, like the language of the statute itself, do not expressly refer to a presumption of competency or any allocation of the burden of proof. These materials demonstrate that in enacting section 709, the Legislature intended to

more effectively safeguard a juvenile's due process right not to be subject to adjudication while incompetent. Toward that end, the statute parts company with the adult competency scheme in certain specified ways that tailor the juvenile competency procedures to better fit the significant developmental differences between adults and juveniles and the distinctions between the adult and juvenile criminal justice systems.

At the same time, however, and most significantly, we discern nothing in the legislative materials from which to infer that lawmakers intended to alter juvenile courts' existing practice of relying on the adult competency provisions in other respects. Specifically, nothing in the legislative history suggests lawmakers intended that Penal Code section 1369's presumption of competency for an adult criminal defendant should not apply to a minor facing adjudication as a ward of the juvenile court under section 601 or 602.

Various legislative materials explained to lawmakers that existing procedures for determining competency in juvenile proceedings derived from the adult competency scheme, the Rules of Court, and judicial decisions. According to the legislation's author, whose statement was included in a number of bill analyses, the overarching problem with the lack of any statutory authority governing the juvenile court procedures was that this absence created uncertainty and inconsistent application of the developing case law. (See, e.g., Sen. Republican Floor Commentaries Assem. Bill No. 2212 (2009-2010 Reg. Sess.) as amended Aug. 5, 2010, p. 1365; Assem. Com. on Appropriations, Analysis of Assem. Bill No. 2212 (2009-2010 Reg. Sess.) as amended Apr. 22, 2010, p. 2; Assem. Com. on Public Safety, Analysis of Assem. Bill No. 2212 (2009-2010 Reg. Sess.) as amended Apr. 8, 2010, p. 3 (Assembly Com. on Public Safety Analysis).) But the specific concerns regarding the application of adult competency procedures in juvenile courts were limited to two primary issues for

14

which there existed no corresponding provisions in the adult competency scheme, namely (1) developmental immaturity as an additional basis for incompetency, and (2) the need for the appointment of experts who are specially trained in the area of juvenile development to accurately evaluate the minor. " 'While case law suggest[s] that courts may rely on adult competency provisions in the absence of a juvenile statute on competency to stand trial, adult competency statutes do not address the nuanced application of "developmental immaturity" outlined in case law relevant to determination of competency in juveniles. . . . . [¶] Moreover, evaluation of children requires a professional expertise on child development, use of assessment instruments unique to evaluation of children in order to identify a mental disorder or developmental disability.' " (Assem. Com. on Appropriations, *supra*, at p. 2.) There is no suggestion that the presumption of competency itself was seen as a problem.

Analyses of the bill prepared for various legislative committees echoed the author's concerns regarding certain *specific* gaps in the adult competency procedures, as applied to juvenile competency proceedings. The analyses also presented the arguments of the bill's institutional supporters, who likewise emphasized the increased understanding of how juveniles " 'think, perceive situations, and process information.' " (Assem. Com. on Public Safety Analysis, *supra,* at p. 9 [quoting an argument by Sacramento County Office of Public Defender].) The interested stakeholders whose statements in support of the proposed legislation were conveyed to lawmakers urged them to enact the bill, in part, to help ensure the constitutional rights of minors accused of crimes. The bill would protect a minor's rights, they argued, by (1) adopting the *Dusky* standard as the definition of juvenile competency, (2) codifying the holding of *Timothy J., supra,* 150 Cal.App.4th 847, that incompetency could be based on a juvenile's developmental immaturity, and (3) requiring that competency evaluations be

conducted by experienced, trained experts in the field of child development. (Assem. Com. on Public Safety Analysis, *supra,* at pp. 8-11.) Notably, however, nothing in the stakeholders' statements or in the bill analyses themselves suggested that prior judicial reliance on the adult scheme should be rejected in any other respect. Nor was there any expression of concern that the adult competency scheme's presumption of competency and associated burden of proof would fail to adequately protect a minor from being adjudicated while incompetent.

Minor points out that the legislative materials made clear there was no preexisting *statutory* authority for resolving doubts regarding competency in a juvenile proceeding. From this he argues that the Legislature would not have viewed the adult competency scheme as existing authority for juvenile competency determinations and, therefore, did not intend that the provisions from the adult scheme would apply in juvenile proceedings unless specifically so identified as being appropriate for minors. Minor's argument is refuted by the legislative materials themselves, which informed lawmakers that, under existing practice, juvenile competency proceedings were governed by a combination of the adult competency statutes, court rules, and judicial decisions. Contrary to minor's assertion, nothing in the history of section 709's enactment suggests that lawmakers considered the proposed legislation to comprise the sole and complete authority for juvenile competency determinations, or a wholesale rejection of procedures derived from the adult competency scheme.

Minor argues furthermore that a presumption of competency for juveniles ignores the research on adolescent brain development, research that includes studies showing that many youth lack the capacity to adequately understand the legal process and assist their attorneys in defending their case. Minor's assertion is essentially a policy argument; indeed, the legislative history described above demonstrates that lawmakers considering whether to enact section 709 were amply

16

informed about the recent advances in understanding a minor's cognitive, psychological, social and moral development. Such information prompted the Legislature to add developmental immaturity as a basis for finding incompetency and to require that competency evaluations be conducted by experts skilled in child development. It is not inconsistent with the Legislature's interest in research on brain development that lawmakers neither eliminated statutory language suggesting that competency would be presumed nor specifically rejected Penal Code section 1369's presumption of competency in wardship proceedings. Rather, it reflects only that the Legislature was seeking to address the concerns raised by that research in ways other than evidentiary presumptions and their associated burdens of proof.

Our review of the legislative history of section 709 suggests lawmakers did not intend to preclude juvenile courts from continuing to apply a presumption of competency to minors subject to wardship proceedings. Our task is not to consider whether it is preferable to presume a minor incompetent, subject to proof by a preponderance of the evidence that he or she is competent to proceed, but rather to discern what the Legislature intended in this regard. We conclude that the Legislature did not intend the enactment of section 709 to alter the existing practice of presuming a minor competent to undergo a wardship proceeding and imposing on the party claiming otherwise the burden of proving incompetency by a preponderance of the evidence.

### b. Policy

The parties devote a sizable amount of their briefing to the policy considerations supporting their respective positions regarding the burden of proof that applies under section 709. The Attorney General argues, for example, that imposition of the burden of proof on a minor who claims incompetency comports

17

with policy concerns because, like an adult criminal defendant, the minor and minor's counsel have superior access to information relevant to competency. (See *People v. Medina, supra*, 51 Cal.3d at p. 885 [concluding that Pen. Code, § 1369, subd. (f), does not offend due process by imposing on defendant the burden of proving incompetency, in part, because defendant and defense counsel likely have better access to the relevant information].) Minor counters that once the juvenile court finds substantial evidence raising a doubt regarding the minor's competency and appoints an expert to evaluate the minor, the *expert* has the best access to the relevant information, which supports allocating the burden of proof to neither party. Minor and amicus curiae on his behalf argue, alternatively, that imposing on the prosecution the burden of proving competency by a preponderance of the evidence advances "the unique and important role that the juvenile justice system has in rehabilitating juveniles" and the policy of protecting the vulnerability of children, especially those regarding whom a court has found substantial evidence raising a doubt as to competency.

We need not resolve the debate regarding the policies supporting allocation of the burden of proof to one party or the other. Because we have concluded that section 709 did not effect a departure from the juvenile courts' application of the adult competency scheme's presumption of competency to minors in wardship proceedings, the policy arguments have been resolved by the Legislature. It necessarily follows from the presumption of competency that the burden of proving incompetency is borne by the party asserting it. As previously mentioned, although the adult competency scheme establishes a presumption of competency, it does not expressly allocate to any party the burden of proof at the competency hearing. We explained in *People v. Rells, supra*, 22 Cal.4th 860, that that statutory scheme's silence on this point is simply a function of the presumption of competency, which, in accordance with Evidence Code section 606, "operates to

impose the burden of proof on the party, if any, who claims that the defendant is mentally incompetent." (*Rells, supra,* at p. 867.) A presumption affecting the burden of proof is one that has been "established to implement some public policy other than to facilitate the determination of the particular action in which the presumption is applied . . . ." (Evid. Code, § 605.) It is well settled that the presumption of competency comes within the category of policy-based evidentiary presumptions affecting the burden of proof. (*Rells, supra*, at p. 868.) Because the presumption of competency applies in a wardship proceeding, the party asserting incompetency bears the burden of proving the minor is incompetent to proceed.

Amicus curiae for minor, the Office of the Public Defender, Sacramento County (Public Defender) argues that maintaining a presumption of competency, once there has been a prima facie showing that the minor is incompetent, is inconsistent with California's policy of presuming that a minor under the age of 14 years is incapable of committing a crime. Under Penal Code section 26, paragraph One, before a minor under the age of 14 years may be adjudged a ward of the juvenile court, the prosecution must prove by clear and convincing evidence that the minor "appreciated the wrongfulness of the charged conduct at the time it was committed." (*In re Manuel L.* (1994) 7 Cal.4th 229, 232; accord, *People v. Cottone* (2013) 57 Cal.4th 269, 280.)

We reject the Public Defender's argument for several reasons. First, although some of the same considerations may be relevant to both the question of competency to stand trial and the question of capacity to commit crime, these inquiries differ in their purpose and scope. (*Timothy J., supra*, 150 Cal.App.4th at p. 862.)

We observe, moreover, that any possible interplay between the presumption of competency and the presumption of incapacity is limited to cases involving minors under the age of 14 years. In such cases, the presumption of competency

arises only if the minor is subject to adjudication under the juvenile law, that is, only after the prosecution has overcome the presumption of incapacity with clear and convincing proof that the minor knew the wrongfulness of his or her conduct. The presumption of competency presents no inconsistency with a presumption of incapacity that has been rebutted.

## B.  Standard of review

The other principal issue we address in this case concerns the standard by which an appellate court reviews a challenge to the sufficiency of the evidence supporting the juvenile court's determination in a competency proceeding under section 709.  Minor argues for de novo review on appeal.  The Attorney General maintains that the deferential substantial evidence review is appropriate here.  As we explain, we agree with the Attorney General that the standard of review applicable in this case is the deferential substantial evidence test.

### *1.  Governing standard*

Decisions by this court have pointed to a verdict in a competency proceeding as an example of the type of "mixed question[] of law and fact" to which a deferential standard of review is applied.  (*People v. Holmes* (2004) 32 Cal.4th 432, 442; see *People v. Cromer* (2001) 24 Cal.4th 889, 895, 900.)  In so doing, we have drawn on the reasoning of *Thompson v. Keohane* (1995) 516 U.S. 99, 113-114, which also pointed to such a determination as an example of a primarily fact-dependent issue that warrants deference in federal habeas corpus proceedings.  (See 28 U.S.C. § 2254(d).)  These precedents describe several factors that help distinguish lower court rulings that are reviewed deferentially from those that require independent review by the appellate court.  First, deferential review is appropriate when the lower court's determination, as with a ruling on competency, is based upon its " 'first-person vantage' " and, "to a

significant extent, on ' "first-hand observations made in open court," ' which that court itself is best positioned to interpret." (*People v. Ault* (2004) 33 Cal.4th 1250, 1267; see *People v. Cromer, supra*, at p. 901; *Thompson v. Keohane, supra,* at p. 114.)  Deferential review of a lower court's ruling such as the determination of competency is proper, moreover, because such a determination is an "individual-specific decision" that is "unlikely to have precedential value." (*Thompson v. Keohane, supra*, at p. 114.)  When a legal rule "acquire[s] content only through application," independent review is indicated, as deference to the trial court's conclusions prevents the appellate court from carrying out its role to "maintain control of, and to clarify, the legal principles." (*Ornelas v. United States* (1996) 517 U.S. 690, 697; see *People v. Cromer, supra*, at p. 896.)  Deference is appropriate, however, when the lower court's determination is "highly individualized" (*Cromer, supra*, at p. 901) and would not likely result in an appellate opinion elucidating rules of general applicability.  (See *Thompson v. Koehane, supra*, at p. 114, fn. 14.)

We conclude that the deferential standard of review that applies to an adult criminal defendant's challenge to the sufficiency of the evidence supporting a verdict in a competency determination (*People v. Samuel* (1981) 29 Cal.3d 489, 505; *People v. Marshall* (1997) 15 Cal.4th 1, 31; *People v. Frye* (1998) 18 Cal.4th 894, 1004), likewise applies to a minor's challenge to the sufficiency of the evidence supporting a juvenile court's determination regarding competency under section 709.  Like the trier of fact in an adult competency trial, the juvenile court often makes its determination by conducting an evidentiary hearing, observing first hand not only the testifying witnesses but also the minor's behavior and interactions with counsel.

Amici curiae on minor's behalf, Youth Law Center and Pacific Juvenile Defender Center, argue in favor of de novo review.  They assert that, unlike in

adult court, where a jury may be called upon to weigh witness testimony, the juvenile courts decide the question of competency primarily on the documentary record of the minor's impairment and the expert's report, which renders deferential review unnecessary. Amici curiae provide no affirmative support, however, for their assertion that determinations in juvenile competency proceedings generally do not involve live testimony, and the case law seems to suggest otherwise. (See, e.g., *In re Alejandro G.* (2012) 205 Cal.App.4th 472, 476 [both of the appointed experts who evaluated the minor prepared reports and testified at the hearing]; *In re Christopher F.* (2011) 194 Cal.App.4th 462, 466 [the expert repeated in court his conclusion that the minor was not competent to proceed].) In any event, a juvenile court's determination regarding competency, even if made in the absence of an evidentiary hearing, may be informed by the court's own observations of the minor's conduct in the courtroom generally, a vantage point deserving of deference on appeal.

A juvenile court's determination regarding competency also is like a verdict in a competency proceeding involving an adult criminal defendant in that both involve an "individual-specific decision" that is "unlikely to have precedential value." (*Thompson v. Keohane, supra*, 516 U.S. at p. 114.) Guided by the same well-settled legal definition of competency, both the juvenile court and the trial court draw their conclusions based on an appraisal of the particular expert testimony by mental health professionals, courtroom observations, and other testimonial and documentary evidence then before the court in the case. Neither determination involves the type of legal rule that acquires " ' "meaning only through its application to the particular circumstances of a case," ' " such as the Fourth Amendment's doctrines of probable cause and reasonable suspicion, for which independent appellate review, rather than deferential review, is appropriate. (*People v. Cromer, supra*, 24 Cal.4th at p. 896.)

Minor contends that independent review is nonetheless required for a juvenile court's determination regarding competency because of the importance of the constitutional right at stake and the consequences of an error by the juvenile court. As minor points out, a juvenile court's erroneous determination that the juvenile is competent could subject the juvenile to an adjudication while incompetent in violation of his or her due process right. The same constitutional considerations apply in adult proceedings, however, yet on appeal the deferential substantial evidence standard of review applies.

### 2. *Nature of the substantial evidence test for reviewing juvenile court determinations under section 709*

We have concluded that an appellate court applies a deferential standard when reviewing a claim that the record does not support the juvenile court's determination in a competency proceeding. Some features of the so-called substantial evidence test will apply to all such challenges on appeal. For example, the appellate court evaluating a claim of insufficient evidence supporting a determination of competency defers to the juvenile court and therefore views the record in the light most favorable to the juvenile court's determination. (See *People v. Samuel, supra*, 29 Cal.3d at p. 505; *People v. Marshall, supra,* 15 Cal.4th at p. 31; *People v. Frye, supra,* 18 Cal.4th at p. 1004.)

There is, however, no single formulation of the substantial evidence test for all its applications. We observe that in the present matter, the evidence before the court consisted of Dr. Kojian's report and testimony, and the written materials on which he based his opinion that minor was not competent to stand trial. The prosecutor did not present any affirmative evidence of competency. Nor was he obligated to do so. As we have explained, under section 709, minor is presumed competent and had the burden of proving incompetency by a preponderance of the evidence. Even if the prosecution presents no evidence of competency, a juvenile

23

court can properly determine that the minor is competent by reasonably rejecting the expert's opinion. This court has long observed that " '[t]he chief value of an expert's testimony in this field, as in all other fields, rests upon the *material* from which his opinion is fashioned and the *reasoning* by which he progresses from his material to his conclusion.' " (*People v. Samuel, supra*, 29 Cal.3d at p. 498.) In a case such as this one, therefore, the inquiry on appeal is whether the weight and character of the evidence of incompetency was such that the juvenile court could not reasonably reject it. (See *Samuel, supra*, at pp. 498-506 [examining the facts on which the defense experts relied and the reasoning by which they arrived at their opinions to conclude that the jury could not reasonably have rejected the defense evidence of incompetence].)

This court has used such a formulation of the substantial evidence test in two closely analogous decisions. The defendant in *People v. Drew* (1978) 22 Cal.3d 333, had entered a plea of not guilty by reason of insanity, which he had the burden of proving by a preponderance of the evidence. At the sanity trial, both of the court-appointed psychiatrists concluded that the defendant was insane at the time of the crime, and the prosecution presented no evidence. (*Id.* at pp. 338-339, 350-351.) In addressing the defendant's claim that the jury's verdict of sanity was not supported by substantial evidence, we explained that under the circumstances of that case, the question on appeal was "whether the evidence contrary to that finding is of such weight and character that the jury could not reasonably reject it." (*Id.* at p. 351.) The record supported the jury's verdict, we concluded, because the jury reasonably could have found that the psychiatrists failed to "present sufficient material and reasoning to justify" their opinions. (*Id.* at p. 351.) We pointed out, for example, that although both experts had diagnosed the defendant as suffering from latent schizophrenia that was characterized by assaultive behavior, neither expert explained why this diagnosis would lead to the conclusion that the

24

defendant met the definition of insanity such that he did not understand that his assault on the police officer victim was wrong. (*Id*. at pp. 350-351.)

A similar formulation of the substantial evidence test appears in *People v. Coogler* (1969) 71 Cal.2d 153. The capital defendant in that case had presented a diminished capacity defense to a charge of first degree deliberate and premeditated murder. (See Pen. Code, former § 1127b.) At the guilt phase of trial, three mental health expert witnesses testified for the defense that the defendant suffered from a disassociation reaction brought on by mental illness at the time of the killings, and each expert expressed the opinion that the defendant could not have acted with premeditation and deliberation. (*Coogler, supra*, at pp. 162-165.) The prosecution did not present any expert witnesses of its own. (*Id*. at pp. 166.) The jury convicted the defendant of first degree murder and ultimately returned a verdict of death. On automatic appeal, the defendant argued that in light of his experts' testimony, the trial court erred by instructing the jury on first degree deliberate and premeditated murder. Reviewing the evidence presented in the case, this court held to the contrary that substantial evidence supported the court's instruction. We explained that a jury properly could reject the experts' conclusions because of the material on which the experts relied. (*Id*. at p. 166-167.) For example, we observed, a jury properly could reject the opinion of the psychiatrist who had relied upon the defendant's own description of previous behaviors and limited recollection of the crimes, but had failed to consider the police reports or preliminary hearing transcripts. (*Id*. at pp. 162, 167.)

The Court of Appeal in the present matter applied a substantial evidence standard when reviewing the juvenile court's competency determination. It erred, however, when describing the contours of that standard. Quoting verbatim from the decision in *In re Christopher F., supra*, 194 Cal.App.4th at page 471, footnote 6, the Court of Appeal characterized the applicable standard as a review of " ' "the

25

whole record to determine whether any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt," ' " stating further that " ' "the record must disclose substantial evidence to support the verdict . . . such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' "**4**

It is evident from both the language of the above quoted standard, and the decision from which that language was drawn, that the Courts of Appeal in *In re Christopher F.* and the present matter were reciting the standard for reviewing a challenge to the sufficiency of the evidence supporting a verdict of *guilt*. (See *In re Christopher F., supra*, 194 Cal.App.4th at p. 471, fn. 6, quoting verbatim from *People v. Zamudio* (2008) 43 Cal.4th 327, 357, which applied the quoted standard to the appellant's challenge to the sufficiency of the evidence supporting his robbery conviction.) A standard of review that inquires whether the record showed substantial evidence from which "a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt" has no application in a challenge to the sufficiency of the evidence supporting a finding of competency, for either a juvenile or an adult criminal defendant. A competency determination does not

---

**4** The Court of Appeal stated as follows: "We review a juvenile court's finding of competence for substantial evidence. 'The same standard governs our review of the sufficiency of evidence in juvenile cases as in adult criminal cases. "[W]e review the whole record to determine whether any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict — i.e., evidence that is reasonable, credible, and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." ' ([*In re*] *Christopher F., supra,* 194 Cal.App.4th at p. 471, fn. 6.)"

26

constitute a finding that the allegations in a wardship petition are true, or that a defendant is guilty of a crime. (*Centeno v. Superior Court* (2004) 117 Cal.App.4th 30, 43 ["competency proceedings are civil in nature and collateral to the determination of defendant's guilt and punishment"].) Nor does a competency determination involve proof beyond a reasonable doubt. (§ 709, subd. (c) [incompetence is proved by a preponderance of the evidence]; Pen. Code, § 1369, subd. (f) [same].) As explained above, the proper formulation of the substantial evidence test for reviewing a challenge to the sufficiency of the evidence supporting a juvenile court's competency determination in a case such as this one, in which the evidence before the court consists of the opinion of a qualified expert concluding that the minor is incompetent to proceed and the materials on which the expert relied, inquires whether the weight and character of the evidence of incompetency was such that the juvenile court could not reasonably reject it.[5]

### C. Application of the standard of review

Under section 709, a minor is incompetent to proceed in a wardship adjudication "if he or she lacks sufficient present ability to consult with counsel and assist in preparing his or her defense with a reasonable degree of rational understanding, or lacks a rational as well as factual understanding, of the nature of the charges or proceedings against him or her." (§ 709, subd. (a).) We have concluded, *ante,* in part II.B., that an appellate court presented with a challenge to the sufficiency of the evidence supporting a juvenile court's competency determination in a case like this one — in which the only evidence before the court was the court-appointed expert's opinion that the minor was incompetent

---

[5]     We disapprove *In re Christopher F., supra,* 194 Cal.App.4th 296, to the extent its articulation of the standard of review is inconsistent with our opinion.

27

and the materials on which the expert relied — reviews the court's determination deferentially, evaluating the record in the light most favorable to the court's determination and upholding it if the appellate court concludes that the court could reasonably reject the evidence of incompetency. Applying that standard here, we conclude that the court could not reasonably have rejected Dr. Kojian's compelling, well-supported, and unequivocal opinion that minor was not competent to proceed to trial.

### 1. Evidence before the juvenile court

#### a. The expert's written report

As previously mentioned, the court appointed forensic psychologist Haig J. Kojian, Ph.D., to evaluate minor's competency to stand trial. (See § 709, subd. (b).) In preparing his report, Dr. Kojian conducted a clinical interview with minor and spoke with minor's mother by telephone. He also reviewed minor's school records and the responding officers' detention reports in the present matter. Based on these sources, Dr. Kojian concluded that minor was not presently competent to stand trial.

Dr. Kojian's report first discusses the results of his mental status examination of minor. According to the report, minor's presentation appeared impaired and there was evidence of an altered thought process. Minor's speech and movements were slow and deliberate, and his gait was rigid. Moreover, his affect appeared incongruent with thought content. For example, he smiled for no reason and out of context. Dr. Kojian noted that minor stated several times that he was confused and repeatedly changed his responses to questions. He also told Dr. Kojian that he was depressed.

When Dr. Kojian indicated that he would like to administer some psychological tests, minor refused, saying, "I just don't feel I need to do this."

Dr. Kojian ultimately managed to assess minor with an abbreviated version of the "Rey 15-Item Test" for ruling out malingering, to which minor responded appropriately.

Dr. Kojian reported that minor was unable to provide any meaningful self-history. For example, although minor correctly reported he was living with his mother, stepfather, and stepsibling at the time he was detained, he also said that he had a good relationship with his parents. Minor denied using alcohol or drugs, which Dr. Kojian found unconvincing. He also denied being in special education classes, which contradicted school records. Although minor reported having been suspended from school once or twice, he could not remember why.

At various points during the evaluation, minor told Dr. Kojian that he was "confused right now." Dr. Kojian reported that, when asked to elaborate, minor "wasn't making much sense." Specifically, minor indicated that his mother was confusing him and that he "didn't know her or her side of the story." Minor also stated, "Hard times . . . problems." When asked to explain, minor indicated he had difficulty with talking, saying, "Just the language . . . in school though" and "little problem."

Dr. Kojian's telephone interview with minor's mother disclosed that although minor had met developmental milestones on a timely basis, he had been diagnosed with "mental problems."

Dr. Kojian devoted most of his report to the issues relevant to a finding of competency, specifically, whether minor is capable of consulting with counsel, assisting in his defense, and understanding the nature of the charges and the proceedings. (See § 709, subd. (a).) Minor's responses to Dr. Kojian's questions suggested to him that minor "was confused and didn't know what was going on."

Some of minor's confusion concerned the reason for his detention. Specifically, when minor was asked why he was in custody he first stated it was

29

for "being on the porch," an apparent reference to his being returned to juvenile detention for violating the terms of his home supervision program (HSP) release. (Minor was aware that he had been detained for several weeks, had been released on HSP, and was then returned to custody.) When Dr. Kojian clarified that he was asking about the original detention, minor indicated he was in custody for "not understanding," "for being confused," and "for his safety." In response to Dr. Kojian's suggestion that these were not crimes, minor said, "Disturbing the peace."

Minor then offered another reason for his being in custody, stating that he had been detained because "it was thought he was using drugs," which he denied. When Dr. Kojian questioned minor further on the subject, minor indicated that a prior drug matter had been resolved "by me understanding it." Minor correctly identified the earlier drug case as a misdemeanor, and stated that misdemeanors were less serious than felonies "such as disturbing the peace."

According to Dr. Kojian's report, minor correctly described some of the aspects of the legal proceedings against him but was confused about, or ignorant of, others. For example, minor knew that a misdemeanor is less serious than a felony, but he did not know the difference between a plea bargain and trial. Minor also expressed some confusion over whether or not he had an attorney. He did not know counsel's name and did not understand counsel's duty and function. Nor was he aware of the prosecutor's function. Minor did know that the judge "makes the decisions," but he did not know what types of decisions those were. He also understood being guilty meant he was "responsible," but he believed that the determination of guilt depended on "whether he attends school."

When Dr. Kojian returned to the subject of the specific charges in the case, minor first indicated he was being charged with disturbing the peace, a crime different from those alleged in the wardship petition. In response to Dr. Kojian's

30

suggestion that that was not the charge, minor said, "messing up my house," "playing with mom and dad," "for not being serious," and "for not going to school." Dr. Kojian hinted to minor that the charges involved a knife, prompting minor to offer various guesses, including "Me risking myself and not being serious?," "Me messing up?," and "For me being confused?"

As previously mentioned, Dr. Kojian's assessment of minor's competency included information gleaned from the detention reports and minor's school records. He noted specifically minor's mother's statement to responding officers that minor recently had stopped taking his medication and that "with each episode he gets worse." He found significant a notation by one of the officers that minor seemed to be having trouble understanding the questions posed to him and appeared "confused." Dr. Kojian also found useful information in what he referred to as minor's IEP (individualized education plan), for example, that minor had been receiving special education services due to a mood disorder. Written assessments by some of minor's teachers included comments such as "He acts like he is under the influence" and he "[does] not seem to know what is going on at all in school."

Based upon his observations and assessment of minor, his interview with minor's mother, and his review of the identified records and reports, Dr. Kojian concluded that minor was impaired and that two underlying issues were causing minor's impairment. Specifically, he found that minor was both "clearly suffering from depression" and that minor's thinking and cognitive functioning was "clearly disrupted." Dr. Kojian acknowledged that because he did not administer any standardized tests to minor, he could not determine the etiology, or source, of the impaired cognitive functioning. He did not believe the impairment was developmental. Rather, he was of the view that minor either could be in the early stages of schizophrenia or other psychotic disease, or that he could be using more

31

drugs or different drugs than earlier reported, which has resulted in organic impairment.

In concluding remarks, Dr. Kojian wrote that "it appears from all accounts" that minor was not competent to stand trial at the present time. He found that minor was "legitimately confused" about what is occurring and that "in his current condition does not have the capacity to meaningfully and rationally cooperate with counsel to prepare a defense or to assist counsel in a meaningful and rational manner." In light of minor's confused and vacillating responses during the interview, Dr. Kojian also questioned whether he fully understood the nature of the proceedings against him. Dr. Kojian acknowledged that perhaps the charges against minor had been reduced to disturbing the peace. In his view, however, minor's statements, for example, his assertion that his drug case had been resolved "because he, now, understands," suggest he is confused about the present charges and the proceedings.

*b.  Expert's testimony at the competency hearing*

Minor's counsel offered to submit the question of minor's competency solely on the basis of Dr. Kojian's report, without an evidentiary hearing. The prosecutor indicated, however, that because Dr. Kojian had not administered any tests to minor, he wanted to question him in this regard. The court granted the prosecutor's request and held a hearing in late April 2012, at which Dr. Kojian was the only witness called to testify. Before questioning commenced, the court granted minor's counsel's request to take judicial notice of two sets of documents in the case file, a probation modification petition and the officers' detention reports.

Dr. Kojian testified regarding his qualifications and the substance of his written report. He indicated that his forensic psychology practice spanned over 20 years, during which time he had evaluated thousands of juveniles.

Much of Dr. Kojian's testimony echoed his written report, and he confirmed that he "had no doubt" minor had an "impairment of some sort." Regarding the sources of that impairment, he reiterated his observation that minor appeared to be depressed and his conclusion that minor's depression could be affecting his functioning. He noted in this regard that the medication minor had been prescribed, Abilify, is used to treat mood disorders. He also repeated his finding that minor's appearance, affect and vacillating responses to his questions, coupled with the statements by minor's teachers, parents, and the officers who detained him, suggested impaired cognitive functioning, and he reaffirmed his view that minor was "legitimately confused." Dr. Kojian testified, consistently with his report, that minor's difficulty explaining what he was being charged with, his erroneous explanations as to why he was in custody, and one responding officer's observation that the minor appeared confused, led him to believe minor could not consult with counsel and did not fully understand what was happening.

At the hearing, Dr. Kojian described in more detail the records that he had reviewed in reaching his opinion that minor was incompetent. Specifically, he had examined the wardship petition, the detention reports, a May 2011 child guidance letter from minor's therapist, Arthur Montes, a licensed clinical social worker, and a January 2011 psychoeducational report by a school psychologist at minor's high school. According to Dr. Kojian, the school records presented a consistent theme that minor is very slow, his testing is low, and that "something is wrong with him."

The prosecutor's questioning of Dr. Kojian focused mostly on whether minor's refusal to be tested affected Dr. Kojian's opinion that minor was

33

incompetent. Dr. Kojian indicated that administering tests would not have changed his opinion. He stated, "If I wasn't 100 percent sure of my opinion I wouldn't have written it in my report the way I wrote it and signed my name." With regard to the issue of malingering, Dr. Kojian explained that a discrepancy between a minor's presentation and other information available to the evaluator, such as comments by parents and teachers, "raises a red flag that someone is 'faking,' " but that no such discrepancy existed here. Dr. Kojian also testified that, in his view, minor did not seem to be malingering. He indicated that he had given minor a brief, "malingering-type" test and that minor "didn't fire on any of those questions."

The prosecutor also questioned Dr. Kojian regarding the passage of time between completion of his report in mid-April 2012, and his testimony at the late April hearing, asking whether it was possible minor could have regained competency during that nine-day period of time. Dr. Kojian explained that competency is not a static condition, and that if it seemed that minor was improving, he might need to be reevaluated. He expressed the view, however, that no doctor can say how a subject is, on the particular day that the doctor testifies regarding an earlier assessment. When pressed by the prosecutor whether his opinion is that minor, as he was then sitting in the courtroom, was incompetent to stand trial, Dr. Kojian indicated that on the day he signed his report he was of the opinion that minor was incompetent but that he did not know what minor's functioning was on the day of the hearing.

During closing argument by the parties, defense counsel recalled that the court had had to read the delinquency petition to minor "word by word." For his part, the prosecutor emphasized his concerns regarding Dr. Kojian's failure to administer any tests to minor and suggested the court appoint a second expert to evaluate him.

34

### c. *Documentary evidence*

After hearing Dr. Kojian's testimony and closing argument by the parties, but before announcing its ruling, the court called a recess in order to review Dr. Kojian's written report and the two documents in the case file that it had agreed to judicially notice. One of the documents in the file was a February 2012 probation modification petition recommending the termination of wardship jurisdiction over minor that stemmed from an incident in 2010. The modification petition included several attachments, one of which was a March 2011 psychoeducational report by the school psychologist at minor's high school that was prepared in connection with a "manifestation determination," which Dr. Kojian had relied upon in forming his opinion. That report is summarized below.

The purpose of a manifestation determination is to decide whether the misbehavior of a special education student with an IEP is related to his or her disability. If it is determined that the student's violation of school rules is a manifestation of the disability, the student is entitled under state and federal law to special disciplinary rules for students with disabilities. (See Ed. Code, § 48915.5; 20 U.S.C. § 1415(k).) The psychoeducational report at issue here indicated that minor had been a special education student since 2006 and was then receiving services in the "mild to moderate" program.

The report covered a number of topics, including minor's medical and educational history, observations by minor's teachers, the results of various standardized assessments of minor conducted in January 2011, and an analysis of whether the assessment results or other information established that minor met the eligibility requirements for certain specified disabilities that would entitle minor to additional special education services.

35

With regard to minor's medical history, the report indicated that he had been diagnosed with a mood disorder for which he was being treated by Arthur Montes. The report concluded that minor met the special education eligibility criteria for disability under the category of "other health impairment" because his diagnosed mood disorder was adversely affecting his educational performance.

The report's discussion of minor's educational history indicated he had excessive unexcused absences and had earned very few units toward graduation. It also showed a fairly lengthy disciplinary record, including an incident that occurred about seven weeks before the manifestation determination report, in which minor was found to be under the influence of marijuana and in possession of a Prozac pill. In connection with that incident, he was arrested for possessing a prescription drug without the prescription and released to his mother. The behavior that appears to have triggered the manifestation determination report occurred six weeks later, when minor was suspended for five days after receiving from another student a backpack containing two stolen cellular telephones.

The report included questionnaire results and comments by many of minor's teachers. Several teachers indicated minor was quiet, inattentive, and unproductive. His "auto-tech" teacher remarked that at times minor showed some mechanical interest but "seems lost . . . most of the time." Minor's English teacher reported that minor "acts like he is under the influence" and "does not seem to know what is going on at all in school."

In summarizing the standardized assessment results, the report indicated that although minor scored in the average range in visual processing of information, he fell within the "low" or "very low" range in numerous, if not most, other areas. His overall intellectual ability, for example, was very low, as was his comprehension, long-term retrieval, processing speed, and short-term memory.

36

Although the report indicated that minor met the special education eligibility criteria for disability under the category of "other health impairment," it showed he did *not* meet eligibility criteria under any other category, including "special learning disability," "speech and language impaired," and "intellectually disabled."

The report ultimately found that the behavior at issue was a manifestation of minor's disability and concluded that his low cognitive and comprehension skills "can make it difficult for him to process the differences between right and wrong" and that "he can be easily influenced to do wrong." The report indicated that its assessment would be reviewed by the IEP team and used to determine appropriate placement and services for minor.

The second document attached to the probation modification petition was a May 2011 letter from minor's therapist, Arthur Montes. The purpose of Montes's letter was to request an "intake assessment" to determine if minor had a developmental disability. Referring to the manifestation determination's psychoeducational report as an "I.E.P.," Montes pointed to its findings regarding minor's subaverage intellectual functioning and extremely low cognitive and comprehension skills as grounds justifying an intake assessment.

### 2. *The court's ruling*

The court began its ruling by describing the evidence it had considered in making its determination. Specifically, the court indicated it had considered Dr. Kojian's testimony and written report, the detention reports, and the probation modification petition, which included the manifestation determination's psychoeducational report and the letter from therapist Arthur Montes. The court observed that it was not obligated to adopt Dr. Kojian's opinion that minor was

37

incompetent to proceed. It found instead that minor was competent and had failed to sustain his burden of showing otherwise by a preponderance of the evidence.

The court took a short recess after announcing its ruling and then went back on the record to briefly explain the grounds on which it had reached its decision. With regard to the documentary evidence, the court indicated it had disregarded Montes's opinion that minor was developmentally delayed because that opinion was simply a "piggyback" of the manifestation determination report, which, the court observed, was not "a full determination of what was needed for the I.E.P." The court noted that school personnel were "still going to be in the process of determining appropriate placement and services."

The court remarked that Dr. Kojian "appeared . . . to have extensive experience" but it nonetheless rejected his opinion that minor was unable to assist his counsel. The court explained that it reached that conclusion, in part, because Dr. Kojian "was not able to fully determine whether there was malingering and was unable to complete the ['Rey 15-Item Test']."

The court also was unpersuaded by Dr. Kojian's conclusion that minor's statements during the interview indicated confusion. The court found to the contrary that minor's characterization of the charges against him were appropriate responses given that minor had been released on HSP but failed to comply with its conditions, and in light of what minor allegedly had done. In the court's view, "messing up my house and not going to school . . . at least was alleged to have been the genesis of what ended up in the charged offenses." The court observed furthermore that minor knew that a misdemeanor was less serious than a felony and understood, correctly, that an earlier offense involving possession of drugs at school had been taken care of.

The other reason cited by the court for rejecting Dr. Kojian's opinion was that the manifestation determination report had not "completely relied" on the

38

"I.E.P. testing" in reaching its conclusion. Specifically, the court found it significant that the report's author believed minor's "cognitive and adaptive delays may have been drug induced" and noted that testing carried out in 2009 did not indicate the same cognitive and adaptive delays shown by the more recent testing.

### 3. *The court could not reasonably reject the expert's conclusion that minor was not competent to proceed*

We have concluded that an appellate court evaluating a challenge to the sufficiency of the evidence supporting a determination of competency under section 709 views the record in the light most favorable to the finding and, in a case like the present matter, asks whether the weight and character of the evidence of incompetency is such that the juvenile court could not reasonably reject it. Applying this formulation of the substantial evidence test here, we conclude that the court could not reasonably have rejected Dr. Kojian's opinion that minor was not competent to stand trial.

The juvenile court could not reasonably call into question the material on which Dr. Kojian based his opinion that minor was not competent to proceed. The expert's evaluation of minor included an assessment of minor's appearance, affect and speech, and a comprehensive interview covering various aspects of minor's background, the reasons for minor's detention, and minor's understanding of his present situation. Dr. Kojian interviewed minor's mother regarding minor's mental health history, and reviewed statements by teachers and responding officers regarding minor's behavior in school and at the time of his arrest, respectively. He also examined school records, which included minor's disciplinary history, his grades, and the results of recent standardized testing for cognitive functioning, intellectual ability, and other skills. Nothing in the record suggested that Dr. Kojian's evaluation had overlooked a significant indicator of competency. And nothing indicates that his inquiry focused on something other

39

than the correct competency standard, namely, minor's present ability to assist counsel in preparing a defense and a rational understanding of the charges and proceedings.

We observe furthermore that Dr. Kojian expressed little reservation regarding his opinion that minor was incompetent. The Attorney General points to certain testimony to suggest Dr. Kojian's opinion was tenuous. Read in context, however, Dr. Kojian's statement that he "believed to a reasonable degree of psychological certainty that [his] opinion was probably correct" and that "it appears . . . that this young man is not competent to stand trial at this time" demonstrated an attempt to express his opinion within professional parameters, and not to suggest any reservations in his views. (Cf. *People v. Marshall, supra*, 15 Cal.4th at p. 32 [expert admitted his opinion that the defendant was incompetent "lacked 'a level of reasonable medical certainty' "].)

One of the court's principal reasons for rejecting Dr. Kojian's opinion was that the expert had not "fully determine[d]" whether minor was malingering and "was unable to complete" the Rey 15-Item Test. On this record, however, the expert's inability to administer a standardized test for malingering did not undermine the reasoning by which he arrived at his opinion. Although the prosecutor questioned Dr. Kojian at length regarding his failure to administer the Rey 15-Item Test for malingering, Dr. Kojian concluded that minor was not malingering and stated he was "100 percent sure" of his opinion notwithstanding minor's refusal to be assessed with objective measures. As he explained, a discrepancy between a minor's presentation during the evaluation and other information available to the evaluator, such as comments by parents and teachers, could suggest the minor is faking his or her responses, but no such discrepancy existed in the present case. Dr. Kojian also indicated that he had given minor a brief malingering-type test and that minor "didn't fire" on any of the questions.

40

This court has long recognized that an expert is "entitled to base his opinion on observations of, and statements made by, the patient during a routine psychological interview." (*People v. Stoll* (1989) 49 Cal.3d 1136, 1155.) We observe that in assessing the strength of an expert's opinion, a juvenile court properly may take into account a minor's refusal to be tested with objective measures. On the record presented here, however, the court could not reasonably point to Dr. Kojian's inability to administer a complete standardized test for malingering as a reason on which to reject the expert's opinion that minor was not competent to stand trial.

In rejecting Dr. Kojian's opinion, the court also pointed to certain statements by minor that, in the court's view, contradicted Dr. Kojian's conclusion that minor was confused. The identified responses were limited and incomplete, however, and did not provide a reasonable basis on which to reject the expert's opinion.

Minor was aware generally that a misdemeanor was less serious than a felony, that a judge makes decisions, and that being guilty means he is "responsible." The record also shows that when the arresting officer gave minor his *Miranda* advisements at the time of his arrest (*Miranda v. Arizona* (1966) 384 U.S. 436), minor invoked his right to silence. But most of minor's answers to Dr. Kojian's questions reflected ignorance of, or confusion regarding, many of the significant features of a juvenile adjudication. For example, minor could not describe the functions of defense counsel and the prosecutor, the differences between a plea bargain and a trial, and the types of decisions that are made by a juvenile court judge. Minor also was uncertain he was being represented by counsel and he believed the determination of his guilt depended on "whether he attends school."

41

Admittedly, some of minor's curious answers as to why he was in custody were explainable. His initial answer that he was in custody for "being on my porch" was understandable in light of the fact he originally was allowed to live at home pending the competency hearing but was returned to juvenile detention 10 days later for violating the conditions of his release pursuant to the Home Supervision Program, presumably by going outside the residence. And minor's statement that he was being charged with "messing up my house" and "not going to school" arguably was an accurate reflection of some of the factual underpinnings of the charges against him, as the court pointed out. But Dr. Kojian's report and testimony indicated that, from the outset, minor seemed to misunderstand what was meant by a criminal charge. During the interview, when told that "being confused" and "not understanding" were not crimes, minor said he was being charged with disturbing the peace. And when informed by Dr. Kojian that that crime was *not* the charge, minor again described the charges in vague, factual terms. Most significantly, as Dr. Kojian observed, minor exhibited no awareness of the most important facts underlying the charges, namely, that he allegedly had threatened family members with a knife. On this record, the court could not reasonably reject the expert's opinion on the basis of isolated statements suggesting minor understood some features of a juvenile proceeding generally, or on the ground that minor's confusion in some respects could be explained.

Nor were any of the other grounds offered by the juvenile court a reasonable basis for rejecting the expert's opinion that minor was incompetent. The court found that evidence of a possible link between minor's drug use and his significant intellectual and adaptive deficits called into question Dr. Kojian's opinion. Specifically, the court emphasized the portion of the manifestation determination report indicating (1) that minor's significant cognitive and adaptive delays shown by the most recent testing "may have been drug induced" and

42

(2) that the results of earlier assessments showed minor's scores in those areas fell within average ranges.  Our examination of the report, however, discloses that this cited evidence concerned the question of the minor's eligibility for special education services based on "intellectual disability," a disability category formerly referred to as mental retardation.  To qualify for special education services under that category it must be shown that the student's significant deficits in intellectual functioning and adaptive behavior "manifested during the developmental period." (Cal. Code Regs., tit. 5, § 3030, subd. (b)(6); see Ed. Code, § 56026, subd. (a).) The school psychologist who authored the report expressed the view that minor's current, significant deficits in intellectual and adaptive functioning adversely affected his educational performance.  But she concluded nonetheless that minor did not meet the eligibility criteria for intellectual disability because minor's deficits appeared to have been drug induced and, according to prior testing, had not arisen during the developmental period.

This evidence was not inconsistent with, nor did it contradict, Dr. Kojian's opinion because his conclusions regarding the conditions causing minor's incompetence were *not* based on a finding of intellectual or developmental disability.  Rather, Dr. Kojian's report to the court expressly stated that one of the causes of minor's incompetency, the impairment of his cognitive functioning, did *not* appear to be developmental in nature.  And to the extent the evidence cited by the juvenile court was relevant to the question of minor's competency, it *supported*, rather than refuted, Dr. Kojian's opinion.  Dr. Kojian had indicated that he found two underlying causes of minor's incompetency, a mood disorder and an impairment in minor's cognitive functioning.  As to the latter condition, Dr. Kojian believed the impairment was attributable to one of two sources — either a serious, emerging mental disease such as schizophrenia, or extensive drug use that had led to organic deficits.  That the manifestation determination report

43

attributed minor's recently assessed cognitive delays to his use of drugs further bolstered one of Dr. Kojian's theories regarding the etiology of minor's impaired thinking.

None of the other reasons given by the court when explaining why it declined to accept Dr. Kojian's opinion were relevant to an assessment of the materials and reasoning used by Dr. Kojian in reaching his conclusion that minor was incompetent. For example, the court indicated it had rejected the belief by Montes, minor's therapist, that minor had a developmental delay because that opinion simply "piggyback[ed]" on the information provided in the manifestation determination report. But Dr. Kojian, consistent with the court's view of Montes's opinion, had expressed the opinion that minor's incompetency was caused, *not* by any developmental disability or delay, but rather by either a mood disorder or substantial impairments in his thought and cognitive functioning.

One final reason for rejecting Dr. Kojian's opinion mentioned by the court was that the manifestation determination report was not a "full" IEP, and that appropriate placement and services for minor had yet to be determined. Even assuming that these points constitute a valid criticism of the material on which Dr. Kojian based his conclusions, the court could not reasonably have relied on them to reject the expert's opinion. The manifestation determination report stated that minor had been diagnosed with a mood disorder. This diagnosis, however, was consistent with similar information Dr. Kojian gleaned from other sources. For example, minor himself had indicated that he was depressed, and Dr. Kojian had learned from the initial detention report that minor was taking Abilify, which he knew is typically used for the treatment of mood disorders. Dr. Kojian's report also referenced the portion of the manifestation determination report in which minor's teachers remarked that he seemed confused and impaired. He did so, however, as further support for his own observations of minor's mental status and

44

apparent confusion during the in-person interview. Notably, Dr. Kojian did *not* rely on the manifestation determination report's summary of the 2011 standardized testing results, which showed significant intellectual and cognitive deficits, as a basis for concluding that minor's cognitive functioning was impaired. Instead, Dr. Kojian acknowledged that because of minor's refusal to be tested during the evaluation, he was unable to pinpoint the cause of that impairment. Given Dr. Kojian's minimal reliance on the manifestation determination report in reaching his conclusions, the court's stated concerns regarding the adequacy of that material did not justify the rejection of Dr. Kojian's opinion.

In arguing that the court reasonably could reject the evidence of incompetency, the Attorney General points to Dr. Kojian's testimony "admitting" that his opinion, although accurate on the day he signed his report, might not reflect minor's mental state on the day of the hearing. We are not persuaded that this line of questioning undermined Dr. Kojian's opinion. An expert's written report necessarily precedes his or her testimony at the competency hearing. On this record, it is speculative that the time between the completion of the report and the date of the hearing renders the expert's opinion stale. Significantly, there was nothing in the record suggesting minor's mental status had improved in the nine days between the date of Dr. Kojian's report and the hearing. We note moreover that the court did not reference the cited testimony when explaining the reasons for rejecting Dr. Kojian's opinion.

The court correctly observed that it was not obligated to accept an expert's opinion of incompetency. This court's decisions have long recognized the propriety of rejecting even unanimous expert opinion, such as when, for example, the experts were unfamiliar with the evidence that would tend to explain the defendant's behavior (*People v. Marks* (2003) 31 Cal.4th, 197, 219), when the experts' opinions were based solely on a brief interview with the defendant

45

(*People v. Marshall, supra*, 15 Cal.4th at p. 32), and when the experts' opinions regarding the defendant's incompetency were tenuous. (*Ibid.*) Similarly, in *In re Alejandro G., supra,* 205 Cal.App.4th 472, 480-481, the Court of Appeal agreed with the juvenile court that the court was under no obligation to accept the experts' opinions that the minor was incompetent. In that case, one of the experts found the minor " 'close to being competent' " and " 'capable of understanding the proceedings,' " while the other expert had evaluated the minor's understanding of the proceedings by asking him questions pertaining to procedures applicable to adult criminal trials, not juvenile adjudications. As previously discussed, however, neither Dr. Kojian's evaluation of minor nor his opinion suffered from similar infirmities.

Amicus curiae National Center for Youth Law has argued that, because of the highly complex nature of juvenile competency proceedings, juvenile courts should defer to the opinion of the court-appointed expert unless there is a clear reason not to do so. We reject the proposition that a court should defer to the opinion of an expert. " 'To hold otherwise would be in effect to substitute a trial by "experts" for a trial by [the finder of fact] . . . .' [Citation.]" (*People v. Samuel, supra,* 29 Cal.3d at p. 498.) We recognize at the same time, however, that although an expert's opinion is not determinative of the question of competency, such an opinion holds special significance in the juvenile competency setting, as contemplated by the Legislature. (See *In re John Z.* (2014) 223 Cal.App.4th 1046, 1058 [the reports and testimony of experts who have evaluated the minor for competency are clearly intended to play a central role in the competency determination under § 709].) Under section 709, the juvenile court must appoint an expert, specially qualified in the field of child development, when there is substantial evidence raising a doubt regarding the minor's competency. (§ 709, subds. (b), (c).) The statutory scheme therefore contemplates the court will make

its determination whether a minor is competent or incompetent with the expert's specialized knowledge and views in mind.  On the record presented in this case, the court's rejection of the expert's opinion was made in the absence of disagreement among qualified experts.  When, as here, the expert concludes that the minor is incompetent but the juvenile court finds flaws in the expert's methodology and reasoning, the court should consider appointing a second expert to inform the court's view that the first expert's opinion is inadequate.  We observe that in the present case, when the prosecutor expressed concerns with the expert's failure to administer standardized tests, he suggested that the court appoint a second expert to evaluate minor.

For the reasons discussed above, we conclude that on the record before us in this case, the juvenile court could not reasonably have rejected the expert's opinion that minor was not competent to proceed.

## III. DISPOSITION

Because the Court of Appeal found that the juvenile court's reasons for declining to accept the expert's opinion were supported by substantial evidence in the record and affirmed the judgment, the Court of Appeal's judgment is reversed.

**CANTIL-SAKAUYE, C. J.**

**WE CONCUR:**

**WERDEGAR, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

**DISSENTING OPINION BY CHIN, J.**


I agree with the majority that, under Welfare and Institutions Code section 709,[1] a minor is presumed competent and bears the burden of proving otherwise by a preponderance of the evidence. However, under the deferential standard of appellate review that applies in light of this conclusion, I would affirm the juvenile court's finding that R.V. was competent. I therefore dissent.

## 1. The Standard of Review.

The standard of appellate review that applies here follows from (1) the majority's conclusion, with which I agree, that R.V. bore the burden of proving incompetency by a preponderance of the evidence, and (2) the juvenile court's finding that R.V. failed to sustain that burden.

In evaluating the sufficiency of the evidence on appeal, appellate courts generally apply the familiar substantial evidence test. Under that test, an appellate court must view the evidence in the light most favorable to the court's judgment, giving it the benefit of every reasonable inference and resolving all conflicts in its favor. (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1053.) The appellate court must "presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances

---

[1] All further unlabeled statutory references are to the Welfare and Institutions Code.

1

reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 60.)

However, as our courts of appeal have explained, where, as here, the trier of fact has found that the party with the burden of proof did not carry that burden, "it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment. This follows because such a characterization is conceptually one that allows an attack on (1) the evidence supporting the party who had no burden of proof, and (2) the trier of fact's unassailable conclusion that the party with the burden did not prove one or more elements of the case [citations]. [¶] Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' [Citation.]" (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528; see *Meister v. Mensinger* (2014) 230 Cal.App.4th 381, 395; *Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838 [same]; *Valero v. Board of Retirement of Tulare County Employees' Assn.* (2012) 205 Cal.App.4th 960, 966; *Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 279 [same]; *Caron v. Andrew* (1955) 133 Cal.App.2d 402, 409.)

Notably, these appellate decisions relied on our decision in *Roesch v. De Mota* (1944) 24 Cal.2d 563. There, after explaining that the trial court had found that the plaintiffs had failed to sustain their burden of proving a certain fact by a

2

preponderance of the evidence, we stated: "The problem here is not whether the appellants on the issue . . . failed to prove their case by a preponderance of the evidence. That was a question for the trial court and it was resolved against them. The question for this court to determine is *whether the evidence compelled the trial court to find in their favor on that issue*. These appellants contend that the testimony of [their witness] was uncontroverted and that it required a finding in their favor. It may be assumed that his testimony was uncontradicted and unimpeached, but it would not necessarily follow that it was of such a character and weight as to leave *no room for a judicial determination* that it was insufficient to support a finding in favor" of the appellants. (*Id.* at pp. 570-571, italics added.)

The same rules apply where the evidence consists of expert opinion. It is well established that a trier of fact is "not automatically required to render a verdict [that] conforms to . . . expert opinion," even if "unanimous." (*People v. Drew* (1978) 22 Cal.3d 333, 350; see *People v. Samuel* (1981) 29 Cal.3d 489, 498 [trier of fact "is not required to accept at face value a unanimity of expert opinion"].) "To hold otherwise would be in effect to substitute a trial by 'experts' for a trial by jury . . . ." (*People v. Wolff* (1964) 61 Cal.2d 795, 811.) As we have explained, "[t]he value of an expert's opinion depends upon the quality of the material on which the opinion is based and the reasoning used to arrive at the conclusion." (*People v. Marshall* (1997) 15 Cal.4th 1, 31-32.) In other words, " '[e]xpert evidence is really an argument of an expert to the court, and is valuable only in regard to the proof of the *facts* and the validity of the *reasons* advanced for the conclusions.' " (*People v. Bassett* (1968) 69 Cal.2d 122, 141.) Thus, as a general rule, the trier of fact remains free to reject even uncontradicted expert testimony after considering the expert's opinion, reasons, qualifications, and credibility, so long as it does not act arbitrarily. (*People v. McDonald* (1984) 37 Cal.3d 351, 371; *People v. Johnson* (1992) 3 Cal.4th 1183, 1231-1232; *Foreman*

*& Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 890.)  The trier of fact's decision in this regard is binding on an appellate court unless the trier of fact could not, in light of the record, reasonably reject the expert's testimony.  (*Samuel*, *supra*, at p. 506; *Drew*, *supra*, at pp. 350-351.)  Under the preceding authorities, the questions here are whether the juvenile court could not have reasonably rejected Dr. Kojian's opinion and whether the weight and character of the evidence compelled the court to find that R.V. had sustained his burden to show incompetency.

## 2.  The Evidence Does Not Compel a Finding of Incompetence.

According to the majority, reversal is necessary because the juvenile court could not reasonably have rejected the opinion of forensic psychologist Haig J. Kojian that R.V. was not competent to proceed.  For reasons that follow, I disagree.

Under the two prongs of section 709, subdivision (a), it was R.V.'s burden to prove by a preponderance of evidence that he lacked either "sufficient present ability to consult with counsel and assist in preparing his . . . defense with a reasonable degree of rational understanding," or  "a rational as well as factual understanding, of the nature of the charges or proceedings against him."  Regarding the latter prong, in the "Opinion" section of his written report, Dr. Kojian expressed, not a firm conclusion, but uncertainty, stating that he "*question[ed]* whether [R.V.] fully knows or understands what is occurring." (Italics added.)  He based his uncertainty on the various statements R.V. had made about the reason for his detention.  In his report, after setting forth those statements, Dr. Kojian stated:  "It appeared to me that [R.V.] was confused and didn't know what was going on."  However, the juvenile court disagreed with Dr. Kojian's reasoning, explaining:  "Given the statements that the minor had said to Dr. Kojian and Dr. Kojian interpreted them as confusion, but knowing that the

4

minor had been released on [the home supervision program], and also knowing what the minor had allegedly done, and [that each] of his responses were appropriate, such as messing up my house and not going to school, because he had refused to go to school, which appeared to have been allegedly the — at least was alleged to have been the genesis of what ended up in the charged offenses." Viewing the evidence in the light most favorable to the court's decision, and giving that decision the benefit of every reasonable inference and resolving all conflicts in its favor, I cannot find that the court *unreasonably* rejected Dr. Kojian's interpretation.

Moreover, Dr. Kojian's testimony at the competency hearing regarding this prong was at least as equivocal as the statements in his report, if not more so. When directly asked whether R.V. "lack[ed] a rational [as] well as factual understanding of the nature of the charges and proceedings against him," Dr. Kojian did not reply with a clear or unqualified "yes." Instead, he replied, "I think it is limited, yes." Dr. Kojian's testimony that R.V. had a "limited" understanding did not compel the juvenile court to find that R.V. had proved by a preponderance of the evidence that he "lack[ed]" the requisite understanding, which is the standard under section 709, subdivision (a).

Indeed, parts of Dr. Kojian's report affirmatively supported the conclusion that R.V. possessed the requisite understanding. The report observed that R.V. "knew, in general, the meanings of guilty or not guilty," that the former "means he is responsible" and the latter means he "could be released home," that "the court makes a decision," and that "misdemeanors are less serious than felonies." The juvenile court expressly mentioned the last of these observations in explaining why it did not accept Dr. Kojian's opinion. Moreover, the record also shows that when advised of his rights upon his arrest, R.V. invoked his right to silence. Viewing the evidence in the light most favorable to the court's decision, giving

5

that decision the benefit of every reasonable inference and resolving all conflicts in its favor, the weight and character of Dr. Kojian's opinion was not such that the juvenile court acted *unreasonably* in finding that R.V. failed to sustain his burden of proof on the second prong of section 709, subdivision (a).

The majority acknowledges that R.V. invoked his right to silence after being advised of his rights, that he was aware generally that a misdemeanor was less serious than a felony, that a judge makes decisions, and that being guilty means he is " 'responsible.' " (Maj. opn., *ante*, at p. 41.) The majority also "[a]dmit[s]" that "some of" R.V.'s statements about the reasons for his detention were "explainable," "understandable," and, "as the [juvenile] court pointed out," an "arguably . . . accurate reflection of some of the factual underpinnings of the charges against him." (Maj. opn., *ante*, at p. 42.) The majority nevertheless declares that R.V.'s statements failed to "provide a reasonable basis" for rejecting Dr. Kojian's opinion because they "were limited and incomplete." (Maj. opn., *ante*, at p. 41.) According to the majority, "most of" R.V.'s statements "reflected ignorance of, or confusion regarding, many of the significant features of a juvenile adjudication," including the functions of defense counsel and the prosecutor, the differences between a plea bargain and a trial, and the types of decisions that a juvenile court judge makes. (*Ibid.*) The majority also asserts that, according to Dr. Kojian's report and testimony, R.V. "seemed to misunderstand what was meant by a criminal charge" and "exhibited no awareness of the most important facts underlying the charges." (Maj. opn., *ante*, at p. 42.) "On this record," the majority declares, R.V.'s statements "suggesting" that he "understood some features of a juvenile proceeding generally" and was not confused about what was happening did not provide a reasonable basis for questioning Dr. Kojian's opinion. (Maj. opn., *ante*, at p. 42.)

6

For several reasons, I disagree with the majority's analysis. First, as explained above, insofar as the record shows that Dr. Kojian based his opinion regarding R.V.'s confusion on statements that, as the majority "[a]dmit[s]," were "explainable," "understandable," and an "arguably . . . accurate reflection of some of the factual underpinnings of the charges against" R.V. (maj. opn., *ante*, at p. 42), the juvenile court could reasonably question Dr. Kojian's reasoning. Second, for reasons explained above, the juvenile court could reasonably conclude that Dr. Kojian's opinion regarding R.V.'s confusion was far more equivocal and uncertain than the majority suggests. As noted earlier, in the "Opinion" section of his report, Dr. Kojian stated that he "question[ed] whether [R.V.] fully knows or understands what is occurring." At trial, Dr. Kojian testified, not that R.V. lacked the requisite understanding, but that he had a "limited" understanding of the nature of the charges and proceedings against him. Third, although, as the majority notes, R.V. told Dr. Kojian he did not know what a judge makes decisions about or what "the duty and function of the DA" are, the majority fails to note that R.V. also told Dr. Kojian that he had "never thought" about the first question and "had never had the time to think about" the second. Given this explanation, the juvenile court could have reasonably questioned whether R.V.'s asserted lack of knowledge about certain legal matters, notwithstanding his understanding of other legal matters, indicated confusion and incompetence. Fourth, and finally, the majority's explanation for concluding that the statements in the record showing R.V.'s understanding of the legal process are too "limited and incomplete" to sustain the juvenile court's decision (maj. opn., *ante*, at p. 41) is inconsistent with the applicable standard of review, which requires us to view the evidence in the light most favorable to the juvenile court's judgment, to give that judgment the benefit of every reasonable inference, and to resolve all conflicts in its favor. Applying this standard, and in light of the preceding discussion, I do not agree that

7

the juvenile court, which itself had the opportunity to observe R.V., acted unreasonably in rejecting Dr. Kojian's opinion.

Regarding the first prong of section 709, subdivision (a), Dr. Kojian stated in his written report: "I . . . believe that in his current condition [R.V.] doesn't have the capacity to meaningfully or rationally cooperate with counsel in the preparation of a defense, or to assist counsel in a meaningful or rational manner." At the hearing, the juvenile court explained that it did "not accept" Dr. Kojian's opinion on this issue "partly because the doctor was not able to fully determine whether there was malingering and was unable to complete the Rey . . . test" for malingering. Significantly, Dr. Kojian's report *itself* provided a basis for the juvenile court's reliance on this consideration in rejecting Dr. Kojian's opinion; the report noted *five separate times* that R.V. "refused to take any tests," and characterized this refusal as "[u]nfortnate[]" four of those times. As specifically relevant to the malingering issue, Dr. Kojian stated in his report: "I tried a few times to get him to comply [with my request for testing] but he refused noting 'I just don't feel I have to do this.' I, even, asked him if he wouldn't mind taking just one, little test (I was trying to give him the REY 15-item to rule out malingering) but he refused." After responding to a few "basic items," R.V. "refused to answer any other questions and said 'I'm not going to say anything else. I am just trying to get help.' " If Dr. Kojian believed that R.V.'s refusal to take any tests was significant — and it is clear from the statements in his report that he did — then surely the juvenile court did not act *unreasonably* in also finding it significant. (See maj. opn., *ante*, at p. 41.)

The majority's explanation for finding otherwise is unpersuasive. (Maj. opn., *ante*, at p. 2.) According to the majority, Dr. Kojian stated during his testimony that "he was '100 percent sure' of his opinion" that R.V. was not malingering "notwithstanding" R.V.'s refusal to submit to testing. (Maj. opn.,

8

*ante*, at p. 40.) However, the record indicates that this statement related, not to R.V.'s refusal to take a test for malingering or to Dr. Kojian's opinion on that subject, but to R.V.'s refusal to take "any cognitive function test." Later, in expounding on what made him believe that R.V. "flunked" the statutory competency test, Dr. Kojian stated rather equivocally, "It didn't seem to me that [R.V.] was attempting to malinger his impairment." At the end of the direct examination, when asked specifically about malingering, Dr. Kojian again equivocally responded, "it didn't seem to me to be malingering." More broadly, notwithstanding the statement the majority cites, Dr. Kojian later expressed notably less certainty about his opinion regarding R.V.'s competence, indicating that, "to a reasonable degree of psychological certainty," it was "probably correct." To be sure, the majority's "context[ual]" reading of the equivocation in Dr. Kojian's remarks — that it "demonstrated an attempt to express his opinion within professional parameters," rather than "any reservations in his views" (maj. opn., *ante*, at p. 40) — is plausible. But the question here is not how *we*, as an appellate court, interpret Dr. Kojian's remarks de novo on a cold record, but whether the contrary interpretation of a juvenile court that actually saw Dr. Kojian testify and observed R.V. in person is *unreasonable*. In my view, the statements the majority cites do not establish that the juvenile court acted unreasonably in considering a factor that Dr. Kojian himself expressly noted numerous times in his report — R.V.'s "unfortunate[]" refusal to submit to testing.

Moreover, in other respects, Dr. Kojian's report and testimony furnished affirmative support for the juvenile court's assessment of Dr. Kojian's opinion regarding R.V.'s ability to assist counsel. At the outset, the report stated that, after being told of the interview's purpose and receiving various advisements — that the interview was nonconfidential and voluntary and that a report would be sent to the court for use "in the current matter" — R.V. "noted that he understood the

9

scope and intent of testing and volunteered to be interviewed." According to the report, R.V.'s "grooming and hygiene were intact," and he "was, largely, oriented and knew the day, date and location." R.V. told Dr. Kojian that "[h]e was involved in counseling and did find it to be helpful." R.V.'s mother told Dr. Kojian that R.V. "was able to meet developmental milestones on a timely basis." As previously noted, the report observed that R.V. "knew, in general, the meanings of guilty or not guilty," that the former "means he is 'responsible' " and the latter means he "could be released home," that "the court makes a decision," and that "misdemeanors are less serious than felonies." In a section entitled "Conclusion and Opinion," the report stated that R.V.'s "thinking *appeared* to be impaired" (italics added), but then immediately explained that R.V. "[u]nfortunately . . . [had] refused to take any tests" that would provide "objective measures" of his functioning and had been "rather disinterested in answering questions." It also explained that R.V.'s apparent cognitive issue did not "appear" to be "developmental in nature" and might have resulted from drug use.

At the hearing, Dr. Kojian stated that he did not know whether R.V. was "intellectually impaired." When asked whether R.V. was "cognitively impaired," Dr. Kojian responded equivocally: "My assessment of him was that there was some type of cognitive process going on that did appear to be evidence for some type of cognitive impairment." Dr. Kojian later testified that if R.V.'s cognitive issue was "substance induced in nature, then it might self-correct," that "you don't need to do anything except sit around and wait," and that "nobody knows" how long it would take for the effect of the drugs to "wear off." The district attorney followed up by asking whether R.V. "could be better" than he had been "16 days earlier" at the time of the interview. Dr. Kojian first responded, "You're correctly pointing out that competency isn't a static variable . . . , so it changes." After stating his opinion that R.V. was not competent "[o]n the day" of the interview or

10

the day the report was signed, Dr. Kojian then noted that he was not responsible for the 16-day gap between the interview and the competency hearing, and stated, "No doctor can tell how an individual is . . . on the day that they testify on [an] assessment that they conducted." The district attorney then explained that he was asking about the time gap because Dr. Kojian had answered "no" when earlier asked at the hearing whether, in his opinion, R.V., "sitting here right now, was . . . competent." Dr. Kojian, after reiterating his opinion that R.V. was not competent on the day the report was signed, stated: "I don't know what his functioning is as he sits here today."

In summary, the record shows considerable equivocation regarding Dr. Kojian's opinion, contains affirmative indications of competence, reveals justifications for questioning Dr. Kojian's reasoning process, and offers a case-specific reason for questioning the effect on Dr. Kojian's assessment of the 16-day gap between the interview and the competency hearing. Of course, as the majority's discussion demonstrates, there was evidence that could reasonably have led the juvenile court to accept Dr. Kojian's opinion. Indeed, based on that evidence, were I making the competency determination de novo, like the majority, I might very well find Dr. Kojian's opinion sufficient to sustain R.V.'s burden of proof. But, giving proper deference to the juvenile court's decision — viewing the evidence in the light most favorable to the court's decision, giving that decision the benefit of every reasonable inference, and resolving all conflicts in its favor — I cannot find that the court acted unreasonably in rejecting Dr. Kojian's opinion or that the evidence was of such weight and character as to compel a finding of incompetence.[2]

---

[2] The majority appears to lose sight of the applicable standard of review in proclaiming *itself* to be "[un]persuaded" that Dr. Kojian's opinion was

*(footnote continued on next page)*

11

Finally, for two reasons, I do not agree with the majority that expert opinion "holds special significance in the juvenile competency setting," or that a juvenile court, upon finding "flaws" in the "methodology and reasoning" of an expert who finds the minor to be incompetent, "should consider appointing a second expert to inform [its] view that the first expert's opinion is inadequate." (Maj. opn., *ante*, at pp. 46-47.)  First, I see no statutory basis for either statement. Regarding the latter, the majority cites no supporting authority of any kind. Regarding the former, the majority observes that section 709 requires a juvenile court to "appoint an expert, specially qualified in the field of child development, when there is substantial evidence raising a doubt regarding the minor's competency." (Maj. opn., *ante*, at p. 46.)  However, in adult criminal cases, the Penal Code requires a court to appoint an expert — sometimes two — if it "has a doubt about the mental competency of a defendant" (*People v. Pokovich* (2006) 39 Cal.4th 1240, 1245), yet expert testimony holds no special significance in such cases.  It is true that section 709, subdivision (b), specifies that the expert appointed in a juvenile case "shall have expertise in child and adolescent development, and training in the forensic evaluation of juveniles, and shall be familiar with competency standards and accepted criteria used in evaluating competence."  But nothing about that mere specification of expertise confers "special significance" on an expert's opinion in juvenile cases.  (Maj. opn., *ante*, at

---

*(footnote continued from previous page)*

"undermined" by the exchange about the 16-day gap between the interview and the hearing.  (Maj. opn., *ante*, at p. 45.)  Under that standard of review, the relevant question is whether, in light of the testimony, the juvenile court could not reasonably consider this gap as one factor in determining the weight of Dr. Kojian's opinion.  As already explained, on the record here, considering that gap would not be unreasonable.

12

p. 46.)  The majority also cites *In re John Z.* (2014) 223 Cal.App.4th 1046 (maj. opn., *ante*, at p. 46), but that decision holds only that a juvenile court unsatisfied with an appointed expert's written report may not make a competency determination without first holding "a formal competency hearing at which [the expert can] testify concerning his [or her] report" (*In re John Z.*, at p. 1058).[3] Here, of course, the juvenile court held such a hearing and made its decision only after listening to Dr. Kojian's testimony.

Second, the majority's statements appear to conflict with well-established principles that the majority expressly reaffirms earlier in the same paragraph:  a juvenile court need not "defer to the opinion of an expert" and "an expert's opinion is not determinative of the question of competency."  (Maj. opn., *ante*, at p. 46.)  In the context of these well-established principles, what does it mean to say that an expert's opinion has "special significance"?  (Maj. opn., *ante*, at p. 46.) How does a juvenile court factor this undefined term into its analysis?  Why must a court that reasonably declines to defer to the expert's opinion because of a flawed methodology or reasoning consider appointing another expert to inform its view of the first expert's opinion?  Does such a court err if it does not appoint a second expert?  In short, the majority's statements, in addition to being without statutory basis, will create confusion and uncertainty for juvenile courts.

For the foregoing reasons, I dissent.

**CHIN, J.**

---

**3**     Another *option*, the court stated, was for the juvenile court to have waited for the report of another expert it had appointed after expressing dissatisfaction with the first report.  (*In re John Z., supra*, 223 Cal.App.4th at p. 1058.)

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** In re R.V.

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 217 Cal.App.4th 296
**Rehearing Granted**

_____

**Opinion No.** S212346
**Date Filed:** May 18, 2015

_____

**Court:** Superior
**County:** Orange
**Judge:** Deborah J. Servino

_____

**Counsel:**

Cindy Brines, under appointment by the Supreme Court, for Defendant and Appellant.

Paulino G. Durán, Public Defender (Sacramento) and Arthur L. Bowie, Assistant Public Defender, for the Office of the Public Defender for Sacramento County as Amicus Curiae on behalf or Defendant and Appellant.

Aimee Feinberg; Tamara Lange and Michael Harris for National Center for Youth Law as Amicus Curiae on behalf or Defendant and Appellant.

Susan L. Burrell and L. Richard Braucher for Youth Law Center and Pacific Juvenile Defender Center as Amicus Curiae on behalf or Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steven T. Oetting, Deputy State Solicitor General, Melissa Mandel, Charles C. Ragland, Kathryn Kirschbaum, Lise S. Jacobson and Sean M. Rodriquez, Deputy Attorneys General, for Plaintiff and Respondent.

1

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Cindy Brines
P.O. Box 138
Verdugo City, CA 91046
(818) 249-4344

Kathryn Kirschbaum
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA 92101
(619) 645-2277