Filed 8/23/16  In re Jennifer R. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re JENNIFER R., a Person Coming Under the Juvenile Court Law. | C080381 |
| THE PEOPLE, | (Super. Ct. No. JV136875) |
| Plaintiff and Respondent, | |
| v. | |
| JENNIFER R., | |
| Defendant and Appellant. | |

In this Welfare and Institutions Code section 602 proceeding, the juvenile court made a finding that the minor, Jennifer R., was competent to proceed with delinquency proceedings within the meaning of Welfare and Institutions Code section 709 (unless otherwise set forth, statutory references that follow are to the Welfare and Institutions

1

Code).  The minor contends there was insufficient evidence to support the court's finding.  We affirm the juvenile court's order.

FACTS AND PROCEEDINGS

The minor, then 12 years old, punched her mother M.H. in the lip causing injury, threw a glass dinner plate at her eight-year-old sister, hitting her in the back, and punched, scratched, and bit her 11-year-old sister.  The minor also threatened to kill her sisters (Y.G. and C.R.), kill the police when they arrived, and behead all Americans.

A delinquency petition (§ 602, subd. (a)) filed February 3, 2015, alleged the minor threatened to commit a crime resulting in death and great bodily injury to M.H., Y.G., and C.R. (Pen. Code, § 422--count one), assault on Y.G. by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4)--count two), misdemeanor use of force and violence on M.H. (Pen. Code, § 242--count three), misdemeanor use of force and violence on C.R. and Y.G. (Pen. Code, § 242--count four), and misdemeanor vandalism of real and personal property belonging to M.H. in the amount of $400 or less (Pen. Code, § 594, subd. (b)(2)(A)--count five).

Minor's counsel declared a doubt as to the minor's competency to stand trial.  The juvenile court suspended proceedings, ordered an evaluation by a licensed psychologist or psychiatrist, and appointed Dr. Frank D. Weber, a psychologist, to complete the evaluation and submit a report.  The minor was subsequently placed on home supervision and released to her mother's care and custody.

One month later, the probation department filed a motion to modify the minor's custody status alleging the minor violated the terms of home supervision by getting suspended from school for fighting and leaving home for unauthorized reasons. Following a detention hearing, the juvenile court ordered the minor detained.

2

Dr. Weber conducted an evaluation of the minor and submitted his report concluding the minor was incompetent to stand trial. Minor's counsel objected to the doctor's conclusion and the matter was set for a contested hearing.

June 26, 2015, Contested Competency Hearing

On June 26, 2015, the juvenile court conducted a contested competency hearing. Dr. Weber, whom the parties stipulated to be a qualified expert, testified regarding his testing and interviewing of the minor. Dr. Weber opined that the minor did not have an intellectual disability or learning disorder and had "a good factual understanding of the court proceedings [and] the participants." He determined the minor's functioning was significantly impacted by her Oppositional Defiant Disorder (ODD), as evidenced by the minor's school discipline records showing 45 disciplinary infractions in one year, the minor's mother's report of "significant behavior problems at school," and minor's counsel's reports that the minor argues with counsel.

Dr. Weber further opined that, based on the minor's history and information provided by the minor's mother, the minor also suffered from Disruptive Mood Dysregulation Disorder (DMDD), which is found in children who "have severe and frequent temper tantrums that interfere with their ability to function at home, in school or with their friends" and "are usually irritable or angry." Dr. Weber opined that the combined effect of ODD and DMDD makes both conditions worse.

Dr. Weber also diagnosed the minor with Cannabis Use Disorder, noting the minor's frequent use of marijuana at 12 years old "with no plans to stop" factored into his evaluation.

In concluding the minor was developmentally immature, Dr. Weber considered the minor's "underestimation of risk," as evidenced by her "marijuana use despite consequences," the fact that she was arguing with her lawyer, her behavioral problems at school without caring about the consequences, and her statement that she "would never

3

plead guilty because sometimes they [district attorneys] lie to you." He noted that, when he asked the minor, "what if the [plea] deal was really good," she said, "Fuck it. I'm not pleading guilty." He also noted the minor had a poor capacity for self-management, as evidenced by her behavioral problems, impulsivity, and "poor emotional regulation," as well as her mother's statements regarding bad behavior at home and her school discipline records.

Dr. Weber concluded the minor was not competent to stand trial based, in large part, on her developmental immaturity, which hindered her ability to assist in her own defense, as well as her diagnoses of ODD and DMDD.

On cross-examination, Dr. Weber acknowledged that he spent one and one-half hours with the minor, during which she was pleasant, not angry or violent, fully cooperative, and very talkative and engaging. The minor gave accurate answers to Dr. Weber's tests, maintained good eye contact and a positive mood, was "nicely groomed," and was articulate. She knew the exact date, could identify the President of the United States, the capitols of California and the United States. The minor's affect was positive, and her short- and long-term memory appeared to be fully intact. She was able to count backwards from 20 to 1, say the alphabet without error, spell the word "world" backwards without problem, and sit down for the entire evaluation with only minimal fidgeting. Dr. Weber told the minor three words and periodically asked her to recall them, which she was able to do immediately and five minutes later. She was able to problem solve and correctly explain the meaning of the proverb, "Don't judge a book by its cover," demonstrating to Dr. Weber that she "had an understanding of at least simple abstract reasoning." The minor was able to articulate information about her family, her family background, and her school background, although some of the information was inconsistent with other information provided to Dr. Weber.

Dr. Weber testified that the minor was truthful in telling him that she attended continuation school and had engaged in "poor behavior," was truant, and had been

4

expelled from school in the sixth grade. She was also truthful about the discord in her family relationships, stating that her relationship with her mother was "horrible." She told Dr. Weber, "We're the same so we fight a lot." She also told Dr. Weber that her stepfather "pisses me off." The minor was open with Dr. Weber about her use of marijuana and did not try to minimize or downplay it.

Dr. Weber's intellectual function tests revealed the minor had an average IQ, an adequate level of intellectual functioning, no intellectual disability, and no learning disabilities. Dr. Weber stated the minor did very well in her mental competence interview and was "probably above average" as compared to other similarly-aged children he has evaluated in the past. He felt the minor "did well and gave accurate answers on a vast majority of items."

With regard to the minor's statements regarding plea bargains, Dr. Weber acknowledged the minor understood the concept of "getting potentially less penalty in return for a guilty plea after one teaching trial," "appreciated the risk involved," and "appreciate[d] the nature of a trade-off."

Dr. Weber admitted that it was "a close call" for him in finding the minor was not competent to stand trial. What ultimately swayed him to find the minor was developmentally immature was "the social/emotional piece and the extent of her behavior problems at home and school."

On redirect, Dr. Weber reiterated that his opinion was based on a number of factors in addition to the hour and a half spent with the minor.

At the conclusion of the hearing, following closing argument by counsel, the juvenile court concluded the minor was competent to stand trial and reinstated delinquency proceedings.

<u>Plea</u> <u>and</u> <u>Disposition</u>

On August 21, 2015, the minor admitted counts three, four, and five, with a maximum confinement time of 16 months. Counts one and two were dismissed. The parties stipulated to a factual basis for the plea. The juvenile court found the minor came within the provisions of section 602 and ordered her to serve 175 days in juvenile hall with credit for 175 days, and 29 days of home supervision with credit for that time as well. The court further ordered the minor to serve 30 days of electronic monitoring.

On September 30, 2015, the minor filed a timely notice of appeal.

DISCUSSION

The minor contends there is insufficient evidence to sustain the juvenile court's finding she was competent to proceed with delinquency proceedings within the meaning of section 709.

Juvenile competency proceedings are governed by section 709, which provides that "[a] minor is incompetent to proceed if he or she lacks sufficient present ability to consult with counsel and assist in preparing his or her defense with a reasonable degree of rational understanding, or lacks a rational as well as factual understanding, of the nature of the charges or proceedings against him or her." (§ 709, subd. (a).) The statute further provides, "If the court finds substantial evidence raises a doubt as to the minor's competency, the proceedings shall be suspended." (*Ibid.*)

A minor is presumed competent to undergo a wardship proceeding. A party claiming otherwise bears the burden of proving incompetency by a preponderance of the evidence. (*In re R.V.* (2015) 61 Cal.4th 181, 196, 200 (*R.V.*).)

The question of the minor's competency is determined at a hearing. "The court shall appoint an expert to evaluate whether the minor suffers from a mental disorder, developmental disability, developmental immaturity, or other condition and, if so, whether the condition or conditions impair the minor's competency. The expert shall

6

have expertise in child and adolescent development, and training in the forensic evaluation of juveniles, and shall be familiar with competency standards and accepted criteria used in evaluating competence." (§ 709, subd. (b).)

" 'If the minor is found to be incompetent by a preponderance of the evidence,' the proceedings remain suspended for a reasonable period of time until it can be determined whether there is a substantial probability that the minor will attain competency in the foreseeable future while the court still retains jurisdiction. (§ 709, subd. (c).) If, on the other hand, 'the minor is found to be competent, the court may proceed commensurate with the court's jurisdiction.' (§ 709, subd. (d).)" (*R.V., supra,* 61 Cal.4th at pp. 191-192.)

An appellate court reviews a challenge to the sufficiency of the evidence supporting the juvenile court's determination in a competency proceeding under section 709 by applying the deferential substantial evidence test. (*R.V., supra,* 61 Cal.4th at pp. 198-199.) The appellate court "defers to the juvenile court and therefore views the record in the light most favorable to the juvenile court's determination." (*Id.* at p. 200.)

In cases such as this, the evidence of incompetency generally consists of the opinion of a qualified expert and the materials on which that expert relied. (*R.V., supra,* 61 Cal.4th at p. 201.) As the Supreme Court noted in *R.V.,* "Even if the prosecution presents no evidence of competency, a juvenile court can properly determine that the minor is competent by reasonably rejecting the expert's opinion. This court has long observed that ' "[t]he chief value of an expert's testimony in this field, as in all other fields, rests upon the *material* from which his opinion is fashioned and the *reasoning* by which he progresses from his material to his conclusion." ' [Citation.] In a case such as this one, therefore, the inquiry on appeal is whether the weight and character of the evidence of incompetency was such that the juvenile court could not reasonably reject it. [Citation.]" (*R.V.,* at pp. 200-201.)

7

The minor claims her case is analogous to *R.V.* and urges us to follow the Supreme Court's lead and reverse the juvenile court's judgment. As we will explain, *R.V.* is distinguishable and we therefore decline to do so.

In *R.V.,* the minor became angry and started throwing and kicking things after being awakened for school. The minor pulled a knife on several members of the household, threatening to kill one if the police were called. (*R.V., supra*, 61 Cal.4th at p. 186.) Once police arrived, the minor became compliant and told officers the knife was in his front pocket, explaining he "was upset and trying to scare his mother" and "had trouble with his parents." One officer's report noted the minor appeared to be having a difficult time understanding questions and "seemed confused about the incident." (*In re R.V.,* at p. 187.) Officers spoke with several witnesses, including landlord Javier Naranjo, who saw the minor stab a bed three times and was threatened with death when he attempted to calm the minor down. (*Id.* at pp. 186-187.) Each witness reported to police that the minor "had psychological problems" and had not taken his medication, Abilify, for the past four weeks. One witness told police the minor was "different every day" and "with each episode he gets worse." (*Id.* at p. 187.)

The minor's counsel expressed doubts as to the minor's competency and the juvenile court suspended juvenile delinquency proceedings, ordered an evaluation, appointed Haig J. Kojian, Ph.D., to conduct the evaluation, and released the minor to home supervision. Ten days later, the minor was returned to juvenile detention for violating the conditions of his release. (*R.V., supra*, 61 Cal.4th at p. 187.)

Dr. Kojian's evaluation of the minor included a clinical interview, telephone conversations with the minor's mother, and review of the minor's school records, and the detention reports prepared by the responding officers. (*R.V., supra*, 61 Cal.4th at p. 203.) According to Dr. Kojian's report, the "minor's presentation appeared impaired and there was evidence of an altered thought process," his "speech and movements were slow and deliberate, and his gait was rigid," his "affect appeared incongruent with thought

8

content," he said several times that he "was confused" and "repeatedly changed his response to questions," and he stated he was depressed. (*Id.* at p. 204.) The minor refused Dr. Kojian's request to conduct psychological tests, but responded appropriately to an abbreviated version of a test to rule out malingering. (*Ibid.*) He gave "unconvincing" responses to self-history questions and contradicted information in his school records. He also told Dr. Kojian several times during the interview that he was " 'confused right now,' " and gave nonsensical responses when asked to elaborate. (*Ibid.*)

The minor's mother informed Dr. Kojian that the minor had been diagnosed with " 'mental problems' " despite having met developmental milestones on a timely basis. (*R.V., supra*, 61 Cal.4th at p. 204.) Dr. Kojian noted the minor's response to questions suggested the minor " 'was confused and didn't know what was going on.' " (*Ibid.*) The minor was aware he had been detained, but seemed confused about the reasons for his detention. (*Id.* at pp. 204-205.) He was able to accurately describe certain aspects of the legal proceedings but was confused or ignorant about others. He was confused about whether or not he had an attorney; he did not know his attorney's name; and he did not understand the function and duty of his attorney, the prosecutor, or the judge. He was under the impression that the question of guilt was dependent upon whether or not he attended school, and was confused about the charges against him. (*Id.* at p. 205.) Dr. Kojian concluded the minor was not competent to stand trial, finding the minor was "impaired" due to the fact that the minor was " 'clearly suffering from depression' " and his "thinking and cognitive functioning was 'clearly disrupted.' " (*Id.* at p. 206.) Dr. Kojian believed the minor's impairment was organic rather than developmental and that the minor could be in the early stages of schizophrenia or another psychotic disease or could be using more or different drugs than reported. (*Ibid.*)

At a subsequent hearing to address the prosecution's concern that Dr. Kojian had not administered any diagnostic tests, Dr. Kojian provided an explanation for the basis

9

for his conclusion of incompetence that was consistent with his written report. (*R.V.*, *supra*, 61 Cal.4th at pp. 187, 206-207.) The juvenile court found the minor had not met his burden of proof and found the minor competent to stand trial. (*Id.* at pp. 187-188, 210.) Thereafter, the minor entered a plea submitting the matter to the juvenile court based on the police report, and the court found the allegations in the wardship petition true. (*Id.* at p. 188.)

The Court of Appeal affirmed the judgment. (*R.V., supra*, 61 Cal.4th at p. 188.) The Supreme Court reversed, concluding the juvenile court could not reasonably have rejected Dr. Kojian's opinion that the minor was incompetent to stand trial. (*Id.* at pp. 186, 211.) The court noted the materials upon which Dr. Kojian based his opinion could not reasonably be called into question, nor did the record suggest Dr. Kojian's evaluation overlooked a significant indicator of competency or focused on an incorrect competency standard. (*Id.* at pp. 211-212.) The court further noted Dr. Kojian "expressed little reservation regarding his opinion that [the] minor was incompetent." (*Id.* at p. 212.) The court rejected the People's claim that Dr. Kojian's inability to administer standardized tests for malingering somehow undermined his opinion, and pointed out that "most of [the] minor's answers to Dr. Kojian's questions reflected ignorance of, or confusion regarding, many of the significant features of a juvenile adjudication," including the functions of the attorneys, the differences between a trial and a plea bargain, and the types of decisions made by the judge. The minor also misunderstood the meaning of a criminal charge and "exhibited no awareness of the most important facts underlying the charges, namely, that he allegedly had threatened family members with a knife." (*Id.* at pp. 212-213.) The Supreme Court concluded the juvenile court could not reasonably have rejected Dr. Kojian's opinion that the minor was not competent to stand trial. (*Id.* at p. 217.)

While the procedural posture and some of the facts in *R.V.* bear some resemblance to those before us, there are key differences which call for a different result here. That is,

that the juvenile court could reasonably reject Dr. Weber's opinion that the minor was not competent to stand trial and instead find her competent.

Viewed in the light most favorable to the juvenile court's determination, the evidence showed that, unlike the minor in *R.V.* who appeared impaired, had an altered thought process, and was confused and repeatedly changed his responses to questions by the evaluating doctor (*R.V., supra,* 61 Cal.4th at p. 204), the minor here was talkative and engaging, had good eye contact, and "was articulate for her age" during Dr. Weber's hour and a half long clinical interview. She was able to pass simple tests, such as counting backwards from 20 to 1 and saying the alphabet without error, and was able to identify the date, the President of the United States, and the capitals of California and the United States, although not the Governor of California. When presented with a simple situational problem, she was able to understand an appropriate solution for the problem. She was also able to demonstrate an "adequate ability to engage in simple abstract thinking" when asked to explain the meaning of a simple proverb. She was not suffering from hallucinations or suicidal or homicidal ideation, was truthful and forthcoming about her behavioral problems, both in and out of school, and did not try to minimize or downplay her marijuana use.

Whereas the minor in *R.V.* had been diagnosed with mental problems, was possibly in the early stages of schizophrenia or some other psychotic disease, and behaved in a manner that suggested impaired cognitive functioning (*R.V., supra,* 61 Cal.4th at pp. 204-207), the minor here had an average IQ, an adequate level of intellectual functioning, no intellectual disability, and no learning disabilities. She tested average in word reading and below average in sentence comprehension and, according to Dr. Weber, did very well in her mental competence interview, giving accurate answers most of the time.

While Dr. Weber based his incompetency finding in large part on the minor's developmental immaturity and her diagnoses of ODD and DMDD which, in his opinion,

11

hindered her ability to assist in her own defense, both his report and testimony confirmed that, unlike *R.V.*, the minor here understood the charges against her and appreciated the degree of seriousness associated with those charges; she understood what happens in a juvenile court trial and appreciated the essential differences between a court trial and simply being told by the school principal that she did something wrong; she was able to understand and appreciate the meaning and consequence of entering a guilty plea, and the roles of the prosecutor, defense lawyer, probation officer, and juvenile court judge; and she understood and appreciated her defense attorney, his role in defending her, and her role in helping her lawyer defend her. Indeed, the minor told Dr. Weber she understood her attorney was "there to help her and . . . she would help her attorney because he is on her side."

Dr. Weber also noted he considered the minor's "oppositional attitude," evidenced by her statement that she would "never plead guilty" and responded, "Fuck it. I'm not pleading guilty," when asked what she would do if "the deal was really good." Although perhaps oppositional, the minor's comments do not necessarily indicate her *inability* to assist in her own defense. As stated in Dr. Weber's report, the minor did not initially understand plea bargains but, after just one teaching trial, quickly learned and understood the concept of "getting potentially less penalty in return for a guilty plea," "appreciate[d] the risk involved," and "appreciate[d] the nature of a trade-off."

Further, as noted by the juvenile court, the minor got along well with Dr. Weber and gave him "her complete cooperation" and, while she "may [have elected] not to cooperate," it was not "out of her control or impossible for her to do."

In sum, while the minor clearly had behavioral problems, impulsivity, and "oppositionality," all of which formed the basis of Dr. Weber's opinion that she suffered from ODD, DMDD, and Cannabis Use Disorder, there is substantial evidence that, unlike the minor in *R.V.*, she was not hampered by any intellectual disability or learning disorder, had an average IQ and an "adequate level of intellectual functions," understood

12

and appreciated the juvenile delinquency process, and was willing and able to and did cooperate in that process when she elected to do so. Based on that evidence, there was a reasonable basis for the juvenile court to reject Dr. Weber's finding that the minor was incapable of assisting in her own defense and conclude the minor was competent to stand trial.

DISPOSITION

The judgment is affirmed.


    HULL    , Acting P. J.


We concur:


    MAURO    , J.


    MURRAY    , J.