Filed 10/6/23  In re M.C. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| In re M.C., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent, v. F.C. et al., Defendants and Appellants. | G062531 (Super. Ct. No. 20DP0657) O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Julie A. Swain, Judge.  Conditionally reversed and remanded with instructions.

Jesse McGowan, under appointment by the Court of Appeal, for Defendant and Appellant F.C.

Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and Appellant J.R.

Leon J. Page, County Counsel, Karen L. Christensen, and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minor.

J.R. (Mother) and F.C. (Father) appeal from the judgment terminating their parental rights to their daughter, M.C., and freeing her for adoption. Mother contends the juvenile court erroneously denied her request to apply the statutory parental-benefit exception to avoid the order. Father contends an insufficient inquiry was made into whether M.C. had Indian ancestry pursuant to federal and California law.[1] We are not persuaded by Mother's contention but, on one aspect of Father's position, we agree. We conditionally reverse and remand with directions. If Indian ancestry is not discovered after proper inquiry consistent with this opinion, the court's judgment is to be reinstated.

FACTS

I. *Minor's Detention*

In May 2020, M.C. was born with methamphetamine in her blood system. She cried inconsolably, had a fever, and exhibited withdrawal symptoms. Mother tested positive for amphetamine use, but denied recently using by asserting she had last consumed methamphetamine during her fourth or fifth month of pregnancy.

M.C. was taken into protective custody by a warrant secured by the Orange County Social Services Agency (SSA). She was eventually placed with maternal relatives (the foster parents) who at all relevant times cared for M.C., expressed a willingness to adopt her, and facilitated Mother's and Father's visits with M.C. during the underlying juvenile court proceedings.[2] M.C.'s removal was based on Welfare and

---

[1] "For these purposes, an "'Indian child'" is a child who (1) is 'a member of an Indian tribe,' or (2) 'is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.' [Citations.] By its terms, this definition turns "'on the child's political affiliation with a federally recognized Indian Tribe,'" not 'necessarily' 'the child's race, ancestry, or "blood quantum." ' [Citation.]" (*In re Dezi C.* (2022) 79 Cal.App.5th 769, 780, fn. 6.)

[2] Instances of conflict between the foster parents and Mother cited in the record are ultimately immaterial to our analysis of the appellate contentions. Also, other individuals who also fostered M.C. are generally not specified because they are not material to the disposition of this appeal.

Institutions Code section 300 [failure or inability to adequately supervise or protect child].[3]

Father was homeless and had an unresolved substance abuse issue and criminal history involving methamphetamine.[4] When M.C. was eight months old, SSA reported to the juvenile court that Father stated if the foster parents retained custody of M.C. he would "take/kidnap" her to Las Vegas to live with her paternal grandmother (i.e., Father's mother). The grandmother, when separately interviewed, reportedly opined Father was "'not doing good'" and expressed her wish that "he would get some help to stop using drugs." Father did not dispute the reported information at any time during the underlying proceedings.

II. *Mother's Case Plan Participation*

In contrast, Mother enrolled in an inpatient sobriety program seven days after M.C. was taken into SSA's custody. At a June 2020 hearing that Mother attended telephonically, the juvenile court told Father: "The child right now is placed with a foster family. If you do not get custody of the child relatively soon, the child will start bonding with other adults, okay, and then it becomes more and more difficult for reunification to happen." Prior to the order at issue in this case, Mother lost her parental rights for four of her other children (M.C.'s older halfsiblings) in separate court proceedings.

In July 2020, Mother, Father, and SSA developed and stipulated to a case plan the juvenile court later incorporated into its jurisdiction hearing order. Father ultimately did not participate in any services agreed to so we focus only on Mother's implementation of her case plan. The case plan stipulated she would have up to seven

---

[3]      All further undesignated statutory references are to the Welfare and Institutions Code.

[4]      For example, Father pleaded guilty in two different 2017 criminal cases to misdemeanor possession of methamphetamine.

hours per week of supervised visits with M.C., and SSA had the option to liberalize visitation parameters.

Mother's case plan also stipulated she would participate in counseling, programs on parenting and substance abuse, and submit to random drug testing. The plan memorialized that she understood "all drug [and] alcohol tests [were] to be negative" and had to inform SSA of "pertinent changes, including but not limited to, changes in address . . . within 48 hours."

Mother participated in programs and had supervised visits with M.C. By the beginning of October 2020, M.C. was in a foster home and Mother was living at a shelter awaiting an opening at a substance abuse treatment facility for women and children. Later that month, an SSA social worker met with Mother and the foster mother caring for M.C. at that time.

According to a subsequent report to the juvenile court, at the October meeting, the social worker "expressed grave concern [to Mother] that [Father was] not engaged in any services and that he [was] likely still an active illegal substance user." The social worker encouraged Mother to "maintain focus and clarity on only herself" and not become distracted by what Father did or did not do. When "the foster mother asked [Mother] if she underst[ood] that she might 'lose' [Father] if he does not change," Mother "cried, but stated repeatedly that she wanted to do what was best for [M.C.]; she wanted her daughter back."

Two weeks later, Mother was admitted to the treatment facility and SSA agreed that M.C. could stay overnight with Mother for a period of 60 days. The trial visit went forward but was terminated after 11 days because, three days before it commenced, Mother submitted a drug test that later came back positive for methamphetamine. Mother denied using any drugs and the social worker later opined that Mother "maintained her relationship with [Father] after she completed her inpatient [sobriety program]."

4

M.C. was returned to her previous foster home and Mother moved into a shared room with her mother and brother. Because the room's rental agreement limited occupancy to two persons, the three eventually moved to a larger room that Mother belatedly informed the social worker about, inconsistent with her case plan stipulation to keep SSA informed of residence changes.

In February 2021, the juvenile court terminated Father's reunification services because he did not participate. The court also ordered Mother and Father to separately visit eight-month-old M.C. Two and a half weeks later, Mother disobeyed the order when, during her visit with M.C., Mother momentarily left and "returned to the [foster parents'] apartment with [Father], much to the [foster parents'] surprise."

In a March 2021 report to the juvenile court, the social worker opined Father was a "part of the reason(s) mother relapsed" and reported that the opinion was shared by the foster parents. The social worker further opined that Mother "seem[ed] to be more motivated to preserve her [drug] addiction and her relationship with [Father] than to creating a safe home for [M.C.]" Mother stated she loved Father in part because he "'gave her a girl,'" but claimed she did not have any ongoing relationship with him because of his nonparticipation in his case plan.

At a June 2021 hearing, the juvenile court accepted SSA's reports as evidence and ordered family reunification services to continue for Mother. The court also approved Mother's agreement to drug test through a patch and ordered Mother to be assessed for unsupervised visits "upon [SSA's] receipt of [Mother's] first clean patch result." Subsequent reports show Mother sharing positive feedback about her sobriety and one-year-old M.C. generally thrived with the foster parents.

After disputes about Mother's participation in visits and whether she maintained interactions with Father, Mother filed a petition seeking unsupervised visits but withdrew it shortly thereafter. Eventually, some unsupervised visits started in January 2022, and in March 2022, SSA held a meeting where Mother and M.C.'s foster

5

mother agreed to attempt another 60-day trial visit for Mother and M.C. at the foster parents' home. That trial visit ended after 15 days, however, because Mother did not stay with M.C. at the agreed residence and did not inform SSA where she and M.C. had been staying. This was not the first time M.C.'s whereabouts had become an issue. In March 2021, SSA had reported, and Mother had not disputed, that during a visit, Mother had stated she was going to take M.C. across the street to a food truck but in reality took M.C. to the home of one of Father's relatives down the street.[5]

Four months after the second failed trial visit, the juvenile court set a permanent plan hearing pursuant to section 366.26 (the .26 hearing) and, the following month, Mother tested positive two more times for methamphetamine use. She again denied using drugs and, for the latter positive test, asserted the result had been caused by her having unprotected sex with a drug user. SSA communicated with the testing lab about Mother's assertion, received an explanation for why the assertion was not plausible, and communicated with Mother about the explanation.

III. *Termination of Parental Rights at the .26 Hearing*

After continuances, the juvenile court conducted the .26 hearing in April 2023, when M.C. was nearly three years old. Relevant to this appeal, Mother requested the juvenile court to apply the parental-benefit exception of section 366.26, subdivision (c)(1)(B)(i), to preserve her parental rights to M.C. and prevent her from being adopted. The court found M.C. to be adoptable by clear and convincing evidence, denied Mother's request, and terminated her and Father's parental rights. Both parents timely appealed and we discuss their contentions in turn.

---

[5]     The record reflects Father did not participate in supervised visits with M.C. from February 2021 to March 2023.

DISCUSSION

I. *Parental-benefit Exception*

      Mother argues the juvenile court failed to properly adjudicate the parental-benefit exception to adoption, which a court is authorized to apply if the asserting parent "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The California Supreme Court recently explained that the exception, one of several listed in the governing statute, "'merely permit[s] the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.' [Citation.]" (*In re Caden C.* (2021) 11 Cal.5th 614, 632 (*Caden C.*).)

      *Caden C.* established three required elements as follows: "[T]he parent asserting the parental[-]benefit exception must show, by a preponderance of the evidence, three things. The parent must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent — the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. When the parent has met that burden, the parental-benefit exception applies such that it would not be in the best interest of the child to terminate parental rights, and the court should select a permanent plan other than adoption. [Citation.]" (*Caden C., supra*, 11 Cal.5th at pp. 636-637.) The elements implicate a hybrid standard of appellate review. "The first two elements involve factual determinations to which the substantial evidence standard of review applies" and the "final step, determining whether termination of parental rights would be detrimental to the child, is reviewed for abuse of discretion." (*In re G.H.* (2022) 84 Cal.App.5th 15, 26.)

7

According to Mother, the juvenile court "fail[ed] to specifically address and apply the elements of *Caden C.* [t]o the facts" of this case. Focusing on the second element, she argues the "court did not properly examine[] the nature of the parent-child relationship to evaluate whether [M.C] had a significant, positive, emotional attachment with Mother." Mother further argues the court's errors were "not harmless because the evidence showed [M.C.] had a substantial, positive, emotional attachment to Mother, and would be harmed by termination of th[e] relationship."

The second *Caden C.* element, whether the child was sufficiently attached to the parent, is "essentially a factual determination [for the juvenile court to decide] whether the relationship [wa]s such that the child would benefit from continuing it." (*Caden C., supra*, 11 Cal.5th at p. 640.) We review the court's implied and explicit findings for substantial evidence (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1156) and do not impose our own view of the record (*Caden C., supra*, 11 Cal.5th at p. 641). Because we are reviewing a court's ruling that the party with the burden failed to carry it, we decide "whether the weight and character of the evidence [that was presented] . . . was such that the juvenile court could not reasonably reject it. [Citation.]" (*In re R.V.* (2015) 61 Cal.4th 181, 201.)

The juvenile court explicitly found that Mother did not show "a substantial positive emotional attachment" between her and M.C.[6] Mother correctly notes the court

---

[6] In addition, the juvenile court found: (1) "both [Mother] and [M.C.] ha[d] enjoyed" Mother's visits; (2) there had been insufficient evidence of "detriment to [M.C.]" resulting from terminating parental rights; (3) there had been insufficient evidence of sufficient "benefit of continuing the relationship between the parent and the child promotes the well-being of the child such that it outweighs the well-being the child would gain in a permanent home"; (4) there had been insufficient "evidence of a positive emotional attachment between the minor and parents such that the child would be greatly harmed"; (5) there had been insufficient evidence of "facts [to] justify overcoming the preference for adoption"; and (6) there had been insufficient "evidence that terminating the attachment would be detrimental to the child when balanced against the benefits of a new adoptive home to the child."

8

did not explicitly discuss its underlying reasoning. For example, the court did not specify a view on the traditional "slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs' [citation]" that are sometimes the focus of appellate opinions. (*Caden C., supra*, 11 Cal.5th at p. 632 [quoting nonexhaustive factors discussed in *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 (*Autumn H.*)].)

On the traditional factors, we imply all findings supported by reasonable and credible evidence of solid value. We conclude M.C.'s young age did not support a finding of a sufficient attachment, nor did the small portion of M.C.'s life spent in Mother's custody. Mother's appellate briefing does not persuade us on these two factors, and we note the fourth *Autumn H.* factor — particular needs of the child — are not implicated in this case.

As to the third *Autumn H.* factor — the positive or negative effect of interaction between Mother and M.C. — Mother cites to visits starting in December 2022 that are documented in the record. For example, Mother describes a February 2023 visit as follows: "Mother picked up [M.C.] in her arms, embraced in [*sic*] her in a hug and proceeded to verbalize positive affirmations such as 'hello princess . . .' [M.C.] was receptive as she continued to smile and laugh. Mother came well prepared for the visit as there was an abundance of food, snacks, clothes, diapers, and toys." We take no issue with the general proposition that M.C. benefited from the visits. We do not doubt Mother's affection for M.C., nor do we ignore her effort to deal with her challenges documented in the record.[7]

---

[7] We also note Father's representation to the juvenile court that he pursued 10 months of substance abuse programs outside of California, starting in the spring of 2022.

But it does not follow that the juvenile court was unreasonable in implicitly concluding benefits from a relationship with Mother were insufficient to show the type of attachment that justifies the parental-benefit exception. (*In re R.V., supra*, 61 Cal.4th at pp. 200-201.) It is well established that friendly and affectionate visits with a biological parent alone do not demonstrate such an attachment. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 468.) We also note Mother's burden was not helped by the fact that a bonding study, although not required, was not requested or presented to the court for its fact-intensive decision on the second and third elements of the parental-benefit exception.

In other words, while Mother correctly notes that "[s]peculation is not evidence," she does not persuade us the juvenile court's determination on sufficient attachment rested on speculation. In any case, even assuming we did not affirm the .26 hearing order based on the second *Caden C.* element, we note we would not discern an abuse of discretion in the court's finding on the third element, i.e., whether terminating M.C.'s attachment to Mother would be detrimental to M.C. when balanced against the countervailing benefit of a new, adoptive home. (*In re G.H., supra*, 84 Cal.App.5th at p. 26.) Based on the above, Mother has not shown prejudicial error even assuming the court did not articulate every finding implicated by her request to apply the parental-benefit exception to prevent M.C.'s adoption.

II. *Indian Ancestry Inquiry*

Next, Father contends we must reverse the .26 hearing order because the juvenile court and SSA failed to fulfill their respective obligations to inquire about possible Indian ancestry pursuant to Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) (ICWA) and related California law.[8] He acknowledges that every person who

---

[8] Because ICWA and relevant California authorities use the term "Indian," we will do the same for consistency. We recognize, however, other terms, such as "Native American" or "indigenous," are preferred by many. (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1.)

was asked about possible Indian ancestry for M.C. (according to the record) answered in the negative, but asserts three groups of extended family members were never asked and should have been. The groups are: (1) two maternal aunts of M.C.; (2) both of M.C.'s grandfathers; and (3) three paternal aunts and one paternal uncle who lived with M.C.'s paternal grandmother.

As noted, for one aspect of Father's position, we agree conditional reversal is required. It is not disputed that one of the maternal aunts described above testified at the evidentiary hearing for Mother's section 388 petition and was not asked about Indian ancestry for M.C. According to federal regulation implementing ICWA, "[s]tate courts must ask each participant in an emergency or voluntary or involuntary child-custody proceeding whether the participant knows or has reason to know that the child is an Indian child." (25 C.F.R. § 23.107(a) (2022); *In re E.V.* (2022) 80 Cal.App.5th 691, 700 [noncompliance with ICWA-based obligations presumed prejudicial]; *In re S.B.* (2005) 130 Cal.App.4th 1148, 1157 [ICWA regulations "are binding in all federal and state courts by virtue of the supremacy clause"].) On remand, an inquiry with the aunt should be made.

For Father's remaining arguments for a conditional reversal, we are not persuaded that an insufficient inquiry occurred. He relies on section 224.2, subdivision (b), and California Rules of Court, rule 5.481(a)(1) (rule 5.481(a)(1)), to argue a "duty of initial inquiry" was not properly discharged. The statute provides: "*If a child is placed into the temporary custody of a county welfare department pursuant to [s]ection 306* or county probation department pursuant to [s]ection 307, the county welfare department or county probation department has a duty to inquire whether that child is an Indian child. Inquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child

11

and where the child, the parents, or Indian custodian is domiciled." (§ 224.2, subd. (b), italics added.)

As the parties discuss in their briefing, there is a present split in appellate court opinions on whether the italicized language above, in section 224.2, subdivision (b), limits Indian ancestry inquiries with extended family members to cases where a minor is taken into protective custody without a warrant. (Compare *In re Robert F.* (2023) 90 Cal.App.5th 492, review granted July 26, 2023, S279743 [warrant-based removal does not trigger duty to inquire with extended family members] with *In re Delila D.* (2023) 93 Cal.App.5th 953 [warrant versus warrantless removal distinction is irrelevant for triggering section 224.2, subdivision (b), duty to inquire].) The split includes opposing views on the enforceability of rule 5.481(a)(1). (*In re Andres R.* (2023) 94 Cal.App.5th 828, 853-854 [reasoning rule should be "disapproved" as contrary to the legislative intent expressed by section 224.2, subdivision (b)].) The rule states in relevant part that "[t]he party seeking a . . . declaration freeing a child from the custody or control of one or both parents, termination of parental rights . . . or adoption must ask the child, if the child is old enough, and the parents, Indian custodian, or legal guardians, extended family members, others who have an interest in the child, and where applicable the party reporting child abuse or neglect, whether the child is or may be an Indian child." (Rule 5.481(a)(1).)

We agree with the analysis set forth in *In re Robert F., supra*, 90 Cal.App.5th at pp. 502-503 [on legislative history bearing on legislative intent of section 224.2] and conclude that because M.C. was taken into protective custody by a warrant in this case, section 224.2, subdivision (b)'s language did not impose the duty of inquiry Father asserts. We also agree with the analysis set forth in *In re Andres R., supra*, 94 Cal.App.5th 828 and conclude that because rule 5.481(a)(1) was promulgated based on section 224.2, subdivision (b), it does not provide a valid basis to impose a duty of inquiry that the statute limited by its statutory language. In sum, we conclude a

conditional reversal is justified only because the maternal aunt who testified in the juvenile court was not asked about Indian ancestry for M.C.

DISPOSITION

The judgment is conditionally reversed and remanded to the juvenile court for the limited purpose of allowing SSA to comply with the ICWA with respect to the testifying aunt. After complying with applicable inquiry and notice requirements consistent with this opinion, if it is determined that ICWA does not apply, the court's judgment shall be reinstated.


O'LEARY, P. J.

WE CONCUR:


SANCHEZ, J.


MOTOIKE, J.